UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| HENGJUN CHAO, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, THE MOUNT SINAI SCHOOL OF MEDICINE, DENNIS S. CHARNEY, M.D., REGINALD MILLER, DVM, ELLEN F. COHN, Ph.D. a/k/a ELLEN BLOCK COHN, MAREK MLODZIK, Ph.D., HANS SNOECK, Ph.D., TERRY KRULWICH, Ph.D., HELEN VLASSARA, M.D., JAMES GODBOLD, Ph.D., LILIANA OSSOWSKI, MSc, Ph.D.,<br><br>Defendants. | Civil Action No.: 10 cv 2869<br><br>**COMPLAINT AND JURY DEMAND**<br><br> |

Plaintiff Hengjun Chao, M.D. ("Dr. Chao" or "Plaintiff"), by his attorneys Deutsch Atkins, P.C., as and for his Complaint and Jury Demand, alleges the following:

## NATURE OF THE ACTION

1.    Dr. Chao brings this action to recover damages and remedies for discrimination due to national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, the New York City Human Rights Law, the New York State Human Rights Law, and Section 1981 of the Civil Rights Act of 1966.  He has also asserted claims under state common law for defamation, breach of contract and related claims.

1

2.      On or about December 28, 2009, Dr. Chao filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of acts of discrimination due to national origin.

3.      On or about March 18, 2010, the EEOC issued Plaintiff a Notice of Right to Sue. Plaintiff has fully complied with the administrative requisites of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), and exhausted the administrative remedies provided therein.

## JURISDICTION AND VENUE

4.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a) (3) and (4), 29 U.S.C. § 621 et seq..  The supplemental jurisdiction of this Court over state, city and common law claims is invoked under 28 U.S.C. § 1367(a).  Prior to filing this Complaint in Court, copies of same were served upon the New York City Commission on Human Rights and the Corporation Counsel.

5.      Venue is proper within this District since the unlawful practices complained of herein all occurred within the Southern District of New York, State of New York, and City of New York.

## THE PARTIES

6.      Dr. Chao resides at 141 Main Street, Tuckahoe, New York 10707.

7.      Upon information and belief, Defendants The Mount Sinai Hospital and the Mount Sinai Medical Center, Inc. ("Mount Sinai") are not-for-profit corporations organized pursuant to the laws of the State of New York with a place of business at One Gustave L. Levy Place, New York, New York 10029.

8.     Upon information and belief, Defendant the Mount Sinai School of Medicine ("MSSM") is a not-for-profit corporation organized pursuant to the laws of the State of New York with a place of business at One Gustave L. Levy Place, New York, New York 10029.

9.     Upon information and belief, at all times relevant to this matter, Defendant Dennis S. Charney, M.D. ("Defendant Charney" or "Dean Charney") served as the Dean of MSSM.

10.     Upon information and belief, Defendant Ellen F. Cohn, Ph.D. a/k/a Ellen Block Cohn ("Defendant Cohn") is an individual who resides at 81 Saint Marks Place, Apt. 2, Brooklyn, New York 11217-4634.

11.     Upon information and belief, at all relevant times, Defendant Reginald Miller, D.V.M. ("Defendant Miller" or "Dr. Miller") served as the Research Integrity Officer at MSSM.

12.     Upon information and belief, at all relevant times, Defendants Marek Mlodzik, Ph.D., Hans Snoeck, M.D., PhD., Terry Krulwich, Ph.D., Helen Vlassara, M.D., and James Godbold, Ph.D. were professors at MSSM and members of the Investigation Committee appointed by Dean Charney.   Dr. Miller also participated in the inquiry conducted by the Investigation Committee (collectively, "the Investigation Committee Defendants" or "the Investigation Committee").

13.     Upon information and belief, at all relevant times, Defendant Liliana Ossowski, MSc, Ph.D. ("Defendant Ossowski") was a Professor Emeritus of Medicine and Oncological Sciences at MSSM.

## FACTS COMMON TO ALL CAUSES OF ACTION

14.     Dr. Chao was born in China.   He received his undergraduate degree from Hunan Medical University and his medical degree from Peking Union Medical College.

3

15.     In 1997, Dr. Chao immigrated to the United States.  From 1997 to 2002, he served as a postdoctoral fellow in the gene therapy center at the University of North Carolina at Chapel Hill and worked in the laboratory of Dr. Christopher Walsh.

16.     In October 2002, Dr. Chao, along with Dr. Walsh, joined MSSM.

17.     Dr. Chao was hired by MSSM as a research assistant professor.

18.     In or about May 2004, Dr. Chao accepted employment as a MSSM Assistant Professor of Medicine on the academic track in the Division of Hematology/Oncology.  This appointment was reviewed and approved by the Committee on Appointments and Promotions, the Executive Faculty and the Board of Trustees.  The term of this initial appointment was until June 30, 2008 ("the Chao Contract of Employment").

19.     The Chao Contract of Employment provided that Dr. Chao would be entitled to a base salary of $115,000; laboratory and office space; access to shared administrative support; and "seed money" of $225,000 over three years to support his research personnel, equipment and supplies.   During the course of his employment, Dr. Chao received several raises and, as of February 2009, his annual salary was $142,000 plus an annual bonus.  His total compensation package—including insurance and other employment benefits—was a little over $180,000.00.

20.     On or about June 22, 2007, the Chao Contract of Employment was renewed and Dr. Chao was reappointed as an Assistant Professor of Medicine on the academic track.  The new term of appointment was from July 1, 2008 until June 30, 2011.

21.     During his tenure at MSSM, Dr. Chao received a number of grants from prestigious funding agencies and successfully distinguished his area of research from that of his mentor, Dr. Walsh.  In his capacity as a principal investigator, he published numerous papers in prestigious scientific journals.

4

22.     On or about April 18, 2007, Dr. Chao was appointed for a five-year term to the graduate faculty of the MSSM Graduate School of Biological Sciences.

23.     In all respects, Dr. Chao met or exceeded MSSM's reasonable expectations.

24.     In or about July 2007, Dr. Chao grew concerned due to irregularities in the experiments of a member of his lab, Defendant Cohn.

25.     Specifically, Dr. Chao observed irregularities in Defendant Cohn's ELISA experiments and asked that his lab technician, Ms. Kelly, repeat these experiments.

26.     Over the next several months, Dr. Chao and the other member of his lab uncovered extensive data fabrications and manipulation by Defendant Cohn.

27.     On September 26, 2007, Dr. Chao reported his findings regarding Dr. Cohn's data manipulation to Defendant Miller.

28.     When Dr. Chao first informed Dr. Miller that Dr. Chao wanted to file formal allegations of misconduct against Dr. Cohn, Dr. Miller told Dr. Chao that if the latter's allegations could not be substantiated and had been submitted for a retaliatory reason, "that could be a very serious problem for you.  So it's something you should reconsider."

29.     When Dr. Chao stated that he still intended to go forward, Dr. Miller "commenced an informal preliminary review" of Dr. Chao's allegations regarding Defendant Cohn and determined that they "could not be supported."

30.     On October 3, 2007, Defendant Cohn filed a complaint against Dr. Chao ("the Cohn Complaint").

31.     In contrast to the manner in which he treated Dr. Chao's complaint, two days after the Cohn Complaint was submitted, Dr. Miller reviewed the allegations with the MSSM Research Integrity Committee ("RIC"); shortly thereafter, an Inquiry Panel was convened.

32.     In contrast, after Dr. Chao resubmitted his complaint against Defendant Cohn on November 20, 2007 ("the Chao Complaint"), Dr. Miller did not meet with the RIC for over a month.  When an inquiry finally was initiated, Dr. Chao was excluded from this process.

33.     Dr. Miller sequestered material and research records from Dr. Chao's lab that were unrelated to the Cohn Complaint and refused to return them or even permit Dr. Chao and his staff to make copies.  Dr. Miller further threatened that he and MSSM had the authority to take away any equipment including computers from Dr. Chao's lab, which had been purchased with funds from Dr. Chao's extramural grant.

34.     When Dr. Chao requested a copy of the inquiry report for the Chao Complaint, Dr. Miller denied this request; in contrast, he provided Dr. Cohn with a copy of the inquiry report for the Cohn Complaint.

35.     In the Cohn Complaint, Defendant Cohn claimed that Dr. Chao refused to repeat a May 2007 experiment and that he had stated to her "that the experiment was 'finished' for him, that he was convinced that his hypothesis had been proven and that the results were ready to be published."

36.     In fact, Dr. Chao had specifically directed Defendant Cohn to repeat this experiment, which was repeated on two occasions prior to the submission of a manuscript detailing these results to the journal Nature Medicine ("the Nature Medicine Manuscript").

37.     In the Cohn Complaint, Defendant Cohn cited to a July 13, 2007 e-mail from Dr. Chao; however, Defendant Cohn omitted the portion in which Dr. Chao told her that she should "repeat the adoptive T cell transfer [experiment]. . ."

38.     In the Cohn Complaint, Defendant Cohn deemed Dr. Chao's complaint against her to be "frivolous and retaliatory" and stated that "there was absolutely no data fabrication" on

6

her part.   Defendant Cohn subsequently admitted that, in fact, she had engaged in the falsification of data, and that she had done so without Dr. Chao's knowledge.

39.     In response to the Chao Complaint and the Cohn Complaint, Defendant Chaney appointed the Investigation Committee.

40.     The Investigation Committee's stated mandate was to investigate allegations of research misconduct made by Dr. Chao against Defendant Cohn and by Defendant Cohn against Dr. Chao.   The inquiry purported to proceed in accordance with Chapter VI of the MSSM Faculty Handbook and 42 CFR Part 93, Subpart A.

41.     The Investigation Committee interviewed Defendant Cohn on at least three occasions.

42.     During these interviews, Defendant Cohn made numerous false statements regarding Dr. Chao.   They include without limitation (i) alleging that Dr. Chao instructed Defendant Cohn to change, switch or alter data and falsify, manipulate and omit results and that this began "[l]ess than a month after" she joined Dr. Chao's lab; and (ii) stating that Dr. Chao "asked [her] to change things, a lot of things, and things that he didn't explicitly ask [her] to change it was implicitly implied that either the data fits my hypothesis, or you will either get fired, you will get not exactly made fun of, but you will be told that you are incompetent, you will be told that you can't do experiments."

43.     The relevant regulation required the Investigation Committee to conduct "an impartial and unbiased investigation"; to interview all individuals "reasonably identified as having information regarding any relevant aspects of the investigation, including witnesses identified by the respondent"; to conduct "an impartial and unbiased investigation to the maximum extent practicable"; and "[to] [p]ursue diligently all significant issues and leads

discovered that are determined relevant to the investigation . . ." 42 CFR § 93.310 (f), (g), (h) (emphasis added).

44.     The Investigation Committee refused Dr. Chao's request that it interview other members of his lab besides Defendant Cohn and lab technician Ms. Kelly.

45.     Dr. Arpita Bharadwaj was a co-author of the Nature Medicine Manuscript described in paragraph 36, supra.

46.     The Investigation Committee refused to interview Dr. Arpita Bharadwaj.

47.     During the course of its inquiry, the Investigation Committee evidenced a bias against Dr. Chao.

48.     For example, during the Investigation Committee's August 12, 2008 interview of Defendant Cohn, Defendant Vlassara noted that "[Dr. Chao]'s ability to communicate and therefore inspire appear to me, perhaps, not the same as the one that you were exposed to before . . . You had no better choice by the way [than to join Dr. Chao's lab], at that point?"  Three months prior to that interview, Defendant Vlassara had asked Defendant Ossowski, "[H]ow did someone with [Defendant Cohn]'s credentials and background end up in Chao's lab?  Do you think - do you have any idea?"  Defendant Krulwich noted further that "her pedigree is so strong that it's an odd choice [to work for Dr. Chao]."

49.     Defendant Vlassara stated to Defendant Cohn during the August 12, 2008 interview "obviously [Dr. Chao] intimidated everyone, including yourself . . ."

50.     During the course of the Investigation Committee's inquiry, Dr. Chao was described as authoritative, which was attributed to his Chinese background and "cultural" differences.

51.     On or about April 7 or April 8, 2009, the Investigation Committee issued its Final Report regarding Dr. Chao ("the Chao Final Report").

52.     The Chao Final Report was disseminated to, *inter alia*, Defendant Charney and the Division of Investigative Oversight of the Office of Research Integrity ("ORI"), which is part of the Department of Health and Human Services.

53.     On or about September 8, 2009, the Division of Investigative Oversight of ORI informed Defendant Miller that it was declining to recommend that ORI pursue findings of research misconduct against Dr. Chao.

54.     In deciding to administratively close the case against Dr. Chao, ORI found either that the alleged misconduct did not meet the definition of research misconduct as defined by 42 C.F.R. 93 or that there was insufficient information to proceed with an inquiry.

55.     In the Chao Final Report, the Investigation Committee made several false and defamatory statements regarding Dr. Chao, including without limitation (i) characterizing him as "remarkably ignorant about the details of his protocol and the specifics of his raw data and cavalier with his selective memory"; (ii) stating that "he was willing to use sloppy data; selective data and manipulated data in order to support his thesis and generate his papers for publication", that he demonstrated "[an] overall pattern of excluding data that did not conform to his hypothesis"; a "general willingness to use selective data and omit inconsistent data"; and "sub-optimal rigor in tracking his projects and [a] willingness to rush to scientific conclusions without a full command of the underlying data"; and (iii) accusing him of "often claim[ing] a lapse in memory when his testimony would have otherwise undermined his position", "us[ing] his memory lapses as a shield to avoid accepting responsibility for his lapses in oversight", and stating that his "responses[] and memory lapses lack[ed] credibility."

56.     The Investigation Committee also deemed Dr. Chao's allegations against Defendant Cohn—who admitted that she had fabricated data on her own initiative—as "unsubstantiated and extreme" and spurious.  In turn, it relegated Defendant Cohn's admission of data fabrication to a footnote in which it noted that Defendant Cohn had "admit[ed] to taking certain actions on her own, without Dr. Chao's knowledge. However, she claims that she did so in response to Dr. Chao's unyielding pressure to generate data consistent with his hypothesis."

57.     In the Chao Final Report, the Investigation Committee concluded that Dr. Chao "promoted a laboratory culture of misconduct and authoritarianism by rewarding results consistent with his theories and berating his staff if the results were inconsistent with his expectations."

58.     Defendant Cohn was the only member of Dr. Chao's lab who had testified in support of the conclusion in paragraph 57, supra.

59.     The Investigation Committee's conclusion in paragraph 57, supra, was in direct contradiction to the testimony of Dr. Chao's lab technician Ms. Kelly, who had worked in Dr. Chao's lab for three years, and who testified that she "never felt pressured to make up things . . . and show [Dr. Chao] what he wanted to hear. . ."

60.     Although the Investigation Committee interviewed Ms. Kelly for two days, it cited to her testimony in the Chao Final Report only to discredit Dr. Chao's concern that the mice blood samples had mistakenly been mislabeled.

61.     Similarly, although the Committee interviewed Dr. Chao's mentor Dr. Walsh, and characterized him as "an experienced researcher" and "a credible witness," it omitted any reference in the Chao Final Report to his assertions that Dr. Chao demonstrated an unimpeachable character and would not engage in data fabrication.  Instead, the Investigation

Committee utilized Dr. Walsh's testimony only to discredit Dr. Chao's statements regarding statistical analysis.

62.     In the Chao Final Report, the Investigation Committee credited the testimony of Defendant Ossowski. It noted that she "had testified that, during a meeting with Dr. Chao, he explicitly advised her that he had asked Dr. Cohn to 'switch mice from one group to another.'" Defendant Ossowski also testified that Dr. Chao had "fired, you know, quite a number of people." She further stated that she was concerned that if Defendant Cohn "finds another Chao, that it may happen again," and opined that "the fact that the paper -- the final paper was put together with [Defendant Cohn] not being there and yet it contained some misrepresentation is one thing that I think indicates that he can do it without her." (collectively, "Defendant Ossowski's Defamatory Statements").

63.     On or about May 7, 2009, Defendant Charney advised Dr. Chao in writing that he was terminating Dr. Chao from the MSSM faculty.

64.     In his letter terminating Dr. Chao, Defendant Charney stated that he was "taking this disciplinary action in accordance with Faculty Handbook guidelines based on the Ad Hoc Committee's findings that you committed research misconduct."

65.     Dr. Chao appealed Defendant Charney's decision terminating his employment and, pursuant to Chapter IV of the Faculty Handbook, the Faculty Disciplinary Tribunal was convened and heard testimony over the course of three sessions.

66.     Before the Faculty Disciplinary Tribunal, Defendant Mlodzik testified as follows: "(i) that [in Dr. Chao's lab] there was a clear disregard for the importance of data"; (ii) "the data was only accepted when it was presented to Dr. Chao by a post doc or a lab member if it fit the hypothesis. If the data did not fit the hypothesis, the person was sent back to repeat the

experiment"; (iii) "Dr. Chao has a very sort of authoritarian way of running his lab, that what he says is what it is, and it's not to be questioned"; (iv) "every post doc in the lab was considered a good person if they delivered data and not questioned comments from Dr. Chao . . . Ellen Cohn, the post doc in question, was, for example, considered a good post doc as long as she was not arguing about what a data point means, or what data means in general. At the point where the issue came up of potential manipulation and switching of data, then obviously Ellen was not considered a good post doc anymore, because she was questioning some of the interpretation of the data"; (v) "it was clear as long as Dr. Chao received data that he considered good to his hypothesis, and also that there was no argument between him and his post docs, he considered people good post docs."; (vi) "the whole culture in the lab that created the situation where it was probably very difficult to kind of use normal results and normal data, because you would have to fit the hypothesis that was preconceived, and whatever fit it was fine, whatever didn't fit had to be repeated so many times until it fit it . . ."; (vii) "Ellen Cohn was the first post doc that lasted more than a few months in the lab. All previous post docs in the lab lasted only a few months, none of them more than six or nine months, if I remember correctly. So those people left the lab because they either couldn't handle it or didn't want to handle it." ("Defendant Mlodzik's Defamatory Testimony").

67.     Before the Faculty Disciplinary Tribunal, Defendant Snoeck testified that Dr. Chao's lab "very rarely had lab meetings" and that a statistical analysis that Dr. Chao utilized was "not based on real data." ("Defendant Snoeck's Defamatory Testimony").

68.     Before the Faculty Disciplinary Tribunal, Defendant Charney stated that Dr. Chao (i) "omitted data points when excluding those points were to his benefit. A review of Dr. Chao's prior papers demonstrates that this is a pattern for him"; (ii) "He would also eliminate data as an

outlier when it was convenient"; (iii) "he had begun to suspect the post doc's data as early as July, and yet he used the data she developed in his preparation of the manuscript that he ultimately submitted in September"; (iv) "Dr. Chao instructed a post doc to switch data in the preparation of a manuscript. He ultimately prepared the manuscript himself with numerous errors and examples of data manipulation. He submitted the manuscript knowing that it was possible that it contained fabricated data"; (v) "He was not forthright with the Investigation Committee"; (vi) "he acted in an inappropriately authoritative manner in his laboratory.  As he, himself, admitted he was happiest with the post doc when they [sic] did not question him or his judgment." ("Defendant Charney's Defamatory Statements").

69.     Before the Faculty Disciplinary Tribunal, Defendant Charney testified that (i) Dr. Chao had "direct[ed] [Defendant Cohn] to switch the data, prepare the draft and repeat the experiments afterwards"; and (ii) "that [Dr. Chao] decided to -- that it was okay to try to publish data and repeat later, to see if it was actually true." ("Defendant Charney's Defamatory Testimony").

70.     On or about November 19, 2009, the Faculty Disciplinary Tribunal sustained Defendant Charney's decision to terminate Dr. Chao.

71.     On or about March 16, 2010, the Appeals Board of the Board of Trustees affirmed the decision of the Faculty Disciplinary Tribunal.

72.     In informing his colleagues of his termination, Mount Sinai/MSSM stated that Dr. Chao had been "fired for data fraud" ("the Data Fraud Allegations").

## FIRST CAUSE OF ACTION
### (Defendant Cohn, Defendant Charney, Investigation Committee Defendants, Defendant Ossowski- tortious interference with contract)

73.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

74.     As evidenced by the Chao Contract of Employment described in paragraphs 18-20, supra, a contract existed between Dr. Chao and Mount Sinai and/or MSSM.

75.     As described in, *inter alia*, paragraphs 30, 35-38, and 42, supra, Defendant Cohn made several false statements regarding Dr. Chao in the Cohn Complaint, during her interviews with the Investigation Committee and to Defendant Ossowski, Gwendalyn J. Randolph, Ph.D. and to other members of the MSSM Faculty ("Defendant Cohn's False Statements").

76.     As described in paragraphs 55-62, supra, the Chao Final Report, prepared by the Investigation Committee Defendants, contained several false statements regarding Dr. Chao.

77.     Defendant Ossowski's Defamatory Statements, as described in paragraph 62, supra, were false.

78.     Defendant Mlodzik's Defamatory Testimony, as described in paragraph 66, supra, was false.

79.     Defendant Snoeck's Defamatory Testimony, as described in paragraph 67, supra, was false.

80.     Defendant Charney's Defamatory Statements and Defamatory Testimony, as described in paragraphs 68-69, supra, were false.

81.     But for the wrongful actions of these defendants, Dr. Chao would have continued to receive the benefits of the Chao Contract of Employment

82.     As a result of said tortious interference, Dr. Chao has been damaged.

14

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against Defendants DENNIS S. CHARNEY, M.D., REGINALD MILLER, DVM,  ELLEN F. COHN, Ph.D. a/k/a ELLEN BLOCK COHN, MAREK MLODZIK, Ph.D., HANS SNOECK, Ph.D., TERRY KRULWICH, Ph.D., HELEN VLASSARA, M.D., JAMES GODBOLD, Ph.D., and LILIANA OSSOWSKI, MSc, Ph.D. on the First Cause of Action and that the following relief be awarded: a) compensatory damages; b) punitive damages; c) pre-judgment interest at an annual rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and attorneys fees as are permitted by rule or law; and e) such other and further relief as this Court deems just and proper.

### SECOND CAUSE OF ACTION
#### (Defendant Cohn, Defendant Charney, Investigation Committee Defendants, Defendant Ossowski- Tortious Interference with Prospective Business Advantage)

83.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

84.    As evidenced by the Chao Contract of Employment and Dr. Chao's employment from October 2002 until May 2009, a business relationship existed between plaintiff and Mount Sinai and/or MSSM ("the Business Relationship").

85.    As reflected in the above-cited false statements (described in, *inter alia*, paragraphs 74-80, supra), Defendant Cohn, Defendant Charney, the Investigation Committee Defendants, and Defendant Ossowsk utilized wrongful means to interfere with the Business Relationship.

86.    As a result of said tortious interference, Dr. Chao has been damaged.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against DENNIS S. CHARNEY, M.D., REGINALD MILLER, DVM,  ELLEN F. COHN, Ph.D.

a/k/a ELLEN BLOCK COHN, MAREK MLODZIK, Ph.D., HANS SNOECK, Ph.D., TERRY

KRULWICH, Ph.D., HELEN VLASSARA, M.D., JAMES GODBOLD, Ph.D., and LILIANA

OSSOWSKI, MSc, Ph.D on the Second Cause of Action and that the following relief be

awarded: a) compensatory damages; b) punitive damages; c) pre-judgment interest at an annual

rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and attorneys fees as are permitted

by rule or law; and e) such other and further relief as this Court deems just and proper.


### THIRD CAUSE OF ACTION
**(Defendant Cohn- Prima facie tort)**

87.    Plaintiff realleges each of the allegations set forth above as if set forth herein at

length.

88.    Defendant Cohn disseminated Defendant Cohn's False Statements (as defined in

paragraph 75, <u>supra</u>) with the intent to inflict harm on Dr. Chao and without any excuse or

justification.

89.    Disinterested malevolence was the sole motivation for Defendant Cohn's conduct.

90.    Her actions caused Mount Sinai/MSSM to terminate the Chao Contract of

Employment, resulting in a loss of salary, laboratory and office space; access to shared

administrative support; "seed money" to support his research personnel, equipment and supplies;

irreparable damage to Dr. Chao's reputation; and additional damages.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered

against ELLEN F. COHN, Ph.D. a/k/a ELLEN BLOCK COHN on the Third Cause of Action

and that the following relief be awarded: a) compensatory damages; b) punitive damages; c) pre-

judgment interest at an annual rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and

attorneys fees as are permitted by rule or law; and e) such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### (All Defendants- Defamation)

91.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

92.     As described in paragraphs 30, 35-38 and 42, supra, Defendant Cohn made several false statements regarding Dr. Chao.

93.     As described in paragraphs 55-62, supra, the Chao Final Report contained several false statements regarding Dr. Chao.

94.     Defendant Ossowski's Defamatory Statements, as described in paragraph 62, supra, were false.

95.     Defendant Mlodzik's Defamatory Testimony, as described in paragraph 66, supra, was false.

96.     Defendant Snoeck's Defamatory Testimony, as described in paragraph 67, supra, was false.

97.     Defendant Charney's Defamatory Statements and Defamatory Testimony, as described in paragraphs 68-69, supra, were false.

98.     As described in paragraph 72, supra, Mount Sinai/MSSM alleged that Dr. Chao had been "fired for data fraud" ("Data Fraud Allegations").

99.     All of the above defendants represented that their false statements regarding Dr. Chao were statements of fact.

100.    Defendant Cohn published the above-referenced statements to, *inter alia*, the Investigation Committee and Dr. Miller.

101.    The Investigation Committee Defendants published the Chao Final Report to, *inter alia*, Defendant Charney, the Disciplinary Tribunal and to the Office of Research Integrity.

102.    Defendant Ossowski published Defendant Ossowski's Defamatory Statements to the Investigation Committee; in turn, Mt. Sinai and/or MSSM published said statements to the Disciplinary Tribunal and the MSSM Board of Trustees.

103.    Defendant Mlodzik published Defendant Mlodzik's Defamatory Testimony to the Faculty Disciplinary Tribunal; in turn, Mt. Sinai and/or MSSM published said statements to the MSSM Board of Trustees.

104.    Defendant Snoeck published Defendant Snoeck's Defamatory Testimony to the Faculty Disciplinary Tribunal; in turn, Mt. Sinai and/or MSSM published said statements to the MSSM Board of Trustees.

105.    Defendant Charney published Defendant Charney's Defamatory Statements and Defamatory Testimony to the Faculty Disciplinary Tribunal and to the MSSM Board of Trustees.

106.    Mount Sinai and/or MSSM published the Data Fraud Allegations to MSSM faculty and/or employees.

107.    Defendant Cohn knew that her false statements regarding Dr. Chao were untrue.

108.    Defendant Ossowski knew that her false statements regarding Dr. Chao were untrue.

109.    Mount Sinai and/or MSSM knew the Data Fraud Allegations were false; at minimum, as evidenced by, *inter alia,* ORI's decision to administratively close Dr. Chao's case without pursuing findings of research misconduct against Dr. Chao, the publication of the Data Fraud Allegations demonstrated spite, ill will, and/or culpable recklessness or gross negligence which constituted a wanton disregard of the rights of Dr. Chao.

18

110.    The Investigation Committee Defendants, Defendant Snoeck, Defendant Mlodzik, and Defendant Charney knew that their false statements regarding Dr. Chao were untrue; alternatively, in failing to ascertain the truth of these statements, they demonstrated spite, ill will, and/or culpable recklessness or gross negligence which constituted a wanton disregard of the rights of Dr. Chao.

111.    Said spite, ill will, and/or culpable recklessness or gross negligence is evidenced by, *inter alia*, the Investigation Committee statements set forth in paragraph 57, <u>supra</u> in the Chao Final Report and Defendant Charney's False Statements set forth in paragraph 68, <u>supra</u>, regarding the alleged authoritarianism of Dr.Chao.

112.    Defendant Cohn, who admitted to data fabrication and who had made several false statements, was the only member of Dr. Chao's lab who had testified in support of this conclusion; said conclusion was in direct contradiction to the testimony of Dr. Chao's lab technician Ms. Kelly; and the Investigation Committee refused to interview the other members of Dr. Chao's lab.

113.    Because they have injured Dr. Chao's professional stature and reputation, the above-referenced false statements regarding Dr. Chao constitute defamation *per se*.

114.    As a result of the above-referenced false statements regarding Dr. Chao, his reputation has been significantly damaged in the scientific and academic community, causing the loss of his employment as a MSSM Assistant Professor of Medicine; other economic opportunities, and mental anguish and emotional distress.

115.    Because the Investigation Committee was an agent of Mount Sinai and/or MSSM, they may be held liable for the Committee's tortious acts.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, THE MOUNT SINAI SCHOOL OF MEDICINE, DENNIS S. CHARNEY, M.D., REGINALD MILLER, DVM, ELLEN F. COHN, Ph.D. a/k/a ELLEN BLOCK COHN, MAREK MLODZIK, Ph.D., HANS SNOECK, Ph.D., TERRY KRULWICH, Ph.D., HELEN VLASSARA, M.D., JAMES GODBOLD, Ph.D., and LILIANA OSSOWSKI, MSc, Ph.D. on the Fourth Cause of Action and that the following relief be awarded: a) compensatory and general damages; b) punitive damages; c) pre-judgment interest at an annual rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and attorneys fees as are permitted by rule or law; and e) such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (All Defendants- Injurious Falsehood/Trade Libel)

116.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

117.    Defendant Cohn's false statements, as described in paragraphs 30, 35-38 and 42, the false statements in the Chao Final Report as described in paragraphs 55-62, supra, Defendant Ossowski's Defamatory Statements, as described in paragraph 62, supra, Defendant Mlodzik's Defamatory Testimony, as described in paragraph 66, supra, Defendant Snoeck's Defamatory Testimony, as described in paragraph 67, supra, Defendant Charney's Defamatory Statements and Defamatory Testimony, as described in paragraphs 68-69, supra, were derogatory to Dr. Chao's professional reputation and were calculated to interfere with his employment with Mount Sinai/MSSM and to prevent others from employing him.

20

118.    These communications played a material and substantial part in inducing Mount Sinai/MSSM to terminate the Chao Contract of Employment, causing Dr. Chao to forfeit his base salary; laboratory and office space; access to shared administrative support; and "seed money" to support his research personnel, equipment and supplies.

119.    In turn, the termination of the Chao Contract of Employment for alleged misconduct (which, as noted above, was causally related to the above-cited false statements) will prevent others from hiring Dr. Chao or otherwise doing business with him.

120.    The Data Fraud Allegations, as described in paragraph 72, <u>supra</u>, were further derogatory to Dr. Chao's professional reputation and were calculated to prevent others from employing or doing business with him.

121.    The research grants that Dr. Chao obtained every 3-4 years amounted to in excess of $3.5 million, thereby resulting in a potential loss of in excess of $20 million.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, THE MOUNT SINAI SCHOOL OF MEDICINE, DENNIS S. CHARNEY, M.D., REGINALD MILLER, DVM, ELLEN F. COHN, Ph.D. a/k/a ELLEN BLOCK COHN, MAREK MLODZIK, Ph.D., HANS SNOECK, Ph.D., TERRY KRULWICH, Ph.D., HELEN VLASSARA, M.D., JAMES GODBOLD, Ph.D., and LILIANA OSSOWSKI, MSc, Ph.D. on the Fifth Cause of Action and that the following relief be awarded: a) compensatory damages; b) punitive damages; c) pre-judgment interest at an annual rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and attorneys fees as are permitted by rule or law; and e) such other and further relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION
### (Mount Sinai and MSSM- Breach of contract)

122.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

123.    As further described in paragraphs 18-20, <u>supra</u>, the Chao Contract of Employment entitled Dr. Chao to employment through the end of June 2011, a base salary; laboratory and office space; access to shared administrative support; and other benefits.

124.    In terminating Dr. Chao's employment without just cause, MSSM/Mount Sinai breached the agreement between the parties.

125.    Due to these aforestated breaches of the agreement, Dr. Chao has been damaged.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, and THE MOUNT SINAI SCHOOL OF MEDICINE on the Sixth Cause of Action and that the following relief be awarded: a) compensatory damages including lost salary of at least $171,500.00; b) additional compensatory damages for lost benefits; c) pre-judgment interest at an annual rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and attorneys fees as are permitted by rule or law; and e) such other and further relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### (Mount Sinai and MSSM- Breach of the implied covenant of good faith and fair dealing)

126.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

127.     Every contract contains an implied covenant of good faith and fair dealing prohibiting either party from destroying or injuring the rights of the other party to receive the benefit of the contract.

128.     By, *inter alia*, subjecting Dr. Chao to an unfair and biased investigation and terminating his employment without just cause, MSSM/Mount Sinai breached the implied covenant of good faith and fair dealing.

129.     As a result of MSSM/Mount Sinai's breach of the implied covenant of good faith and fair dealing, plaintiff has been damaged.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, and THE MOUNT SINAI SCHOOL OF MEDICINE on the Seventh Cause of Action and that the following relief be awarded: a) compensatory damages; b) punitive damages; c) pre-judgment interest at an annual rate of 9% per C.P.L.R. § 5001(a); d) such other costs of suit and attorneys fees as are permitted by rule or law; and e) such other and further relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Mount Sinai and MSSM—
### Title VII- Discrimination

130.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

23

131.    MSSM/Mount Sinai has fifteen or more persons in its employ, and therefore qualifies as an "employer" under Title VII.

132.    Title VII makes it unlawful for an employer to discriminate against any individual because of his race or national origin.

133.    Dr. Chao is Chinese and, therefore, is a member of a protected class.

134.    Although he was competent to perform his job and/or was performing his duties satisfactorily, Dr. Chao suffered an adverse employment decision or action.

135.    As evidenced by, *inter alia*, the different manner in which Dr. Chao and Defendant Cohn were treated, the biased manner in which the Investigation Committee conducted their inquiry regarding Dr. Chao, and the description of Dr. Chao as authoritative, which was attributed to his Chinese background and "cultural" differences, the decision to terminate Dr. Chao's employment gives rise to an inference of discrimination based on his membership in the protected class.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, and THE MOUNT SINAI SCHOOL OF MEDICINE on the Eighth Cause of Action for a) compensatory damages including without limitation back pay, front pay, pension and other lost benefits that he would have received but for defendants' actions; b) additional compensatory damages for the emotional distress defendants' unlawful conduct has caused plaintiff; c) punitive damages; d) interest; e) counsel fees and costs; f) such equitable and injunctive relief as may be appropriate; and g) such other relief as the court deems just and appropriate under the circumstances.

## NINTH CAUSE OF ACTION
### (Mount Sinai, MSSM and Defendant Charney-
### Executive Law § 296 – Discrimination)

136.     Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

137.     MSSM/Mount Sinai has more than four persons in its employ, and therefore qualifies as an "employer" under the New York Human Rights Law ("HRL").

138.     The HRL prohibits an employer from discriminating against or discharging an employee because of his race, creed, color, or national origin.

139.     Dr. Chao is Chinese and, therefore, is a member of a protected class.

140.     Although Dr. Chao was qualified for his position and had performed his duties effectively, he was nevertheless terminated.

141.     There was no independently legitimate reason for Plaintiff's termination; rather, as described in, *inter alia*, paragraph 135, supra, the reasons provided were pretexts for and/or substantially influenced by unlawful discrimination.

142.     Having aided and abetted the discriminatory, unlawful termination of Dr. Chao, and because he had the power to hire and fire employees, Defendant Charney may be held personally liable.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D. demands that judgment be entered against THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, THE MOUNT SINAI SCHOOL OF MEDICINE and DENNIS S. CHARNEY, M.D on the Ninth Cause of Action for a) compensatory damages including without limitation back pay, front pay, pension and other lost benefits that he would have received but for defendants' actions; b) additional compensatory damages for the emotional distress defendants' unlawful conduct has

caused plaintiff; c) interest; d) counsel fees and costs; e) such equitable and injunctive relief as may be appropriate; and f) such other relief as the court deems just and appropriate under the circumstances.

**TENTH CAUSE OF ACTION**
**(Mount Sinai, MSSM and Defendant Charney --**
**New York City Administrative Code § 8-107)**

143.   Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

144.   As described in, *inter alia*, paragraph 135, supra, in terminating Dr. Chao, MSSM/Mount Sinai discriminated against him on the basis of his national origin.

145.   Under the New York City Human Rights Law ("CHRL"), it is unlawful for an employer *or* an employee or an agent of the employer to engage in discriminatory employment practices.

146.   Accordingly, both MSSM/Mount Sinai and Defendant Charney may be held liable under the CHRL.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D., demands that judgment be entered against Defendants THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, THE MOUNT SINAI SCHOOL OF MEDICINE, and DENNIS S. CHARNEY, M.D. on the Tenth Cause of Action and that the following relief be awarded a) compensatory damages including without limitation back pay, front pay, pension and other lost benefits that he would have received but for defendants' actions; b) additional compensatory damages for the emotional distress defendants' unlawful conduct has caused plaintiff; c) interest; d) punitive damages pursuant to, *inter alia*, New York City Administrative Code § 8-205A; e) attorneys fees, costs,

26

and expenses pursuant to, *inter alia*, New York City Administrative Code § 8-205A; f) such equitable and injunctive relief as may be appropriate; and g) such further relief as the Court deems equitable, appropriate and just.

**ELEVENTH CAUSE OF ACTION**
**(Mount Sinai and MSSM- 42 U.S.C. § 1981)**

147.    Plaintiff realleges each of the allegations set forth above as if set forth herein at length.

148.    Having been born in China, Dr. Chao is of Asian descent and therefore is a member of a racial minority.

149.    Section 1981 guarantees each person, regardless of race or citizenship, freedom from discrimination in the making and enforcing of contracts.

150.    Because of his race, Dr. Chao was offered less favorable contractual terms or unequal treatment and/or denied the right to contract entirely.

151.    Accordingly, Mt. Sinai and MSSM have violated section 1981.

WHEREFORE, Plaintiff HENGJUN CHAO, M.D., demands that judgment be entered against Defendants THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER and THE MOUNT SINAI SCHOOL OF MEDICINE on the Eleventh Cause of Action and that the following relief be awarded: a) compensatory damages; b) interest; c) punitive damages; d) attorneys fees, costs, and expenses; e) such equitable and injunctive relief as may be appropriate; and f) such further relief as the Court deems equitable, appropriate and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all causes so triable.

Dated: Hackensack, New Jersey
       March 29, 2010

               Yours, etc.,

               DEUTSCH ATKINS, P.C.

By:                                          
               Andrew M. Moskowitz (AM-9671)
               25 Main Street, Suite 104
               Court Plaza North
               Hackensack, New Jersey 07601
               (201) 498-0900