**STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

**HENGJUN CHAO, M.D.,**

**Plaintiff,**

**- against -**

**THE MOUNT SINAI HOSPITAL, THE MOUNT SINAI MEDICAL CENTER, THE MOUNT SINAI SCHOOL OF MEDICINE, DENNIS S. CHARNEY, M.D., REGINALD MILLER, DVM, ELLEN F. COHN, Ph.D., a/k/a/ ELLEN BLOCK COHN, MAREK MLODZIC, Ph.D., HANS SNOECK, Ph.D., TERRY KRULWICH, Ph.D., HELEN VLASSARA, M.D., JAMES GODBOLD, Ph.D., LILIANA OSSOWSKI, MSc, Ph.D.,**

**Defendants.**

-------------------------------------------------------------x

**10 CV 2869 (HB)**

**OPINION & ORDER**

**Hon. Harold Baer, Jr., District Judge:**

Plaintiff Dr. Hengjun Chao asserts claims for defamation and other torts arising from a series of statements made during the course of an investigation and disciplinary proceeding related to allegations of research misconduct. Dr. Chao also brings contract-related claims in connection with the termination of his employment contract as well as claims for race-based discrimination under federal, state and local law. Defendants move to dismiss the claims for defamation and other torts, but have not challenged the remaining claims. Although both parties have been unable to follow the page limits permitted and their briefs far exceed the length allowed, I have considered the entirety of their submissions. For the reasons that follow the motion to dismiss is GRANTED in part and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

**The genesis of the dispute and allegations of research misconduct**

In 2007 Dr. Chao worked for Defendant Mount Sinai School of Medicine ("MSSM") as an Assistant Professor and medical researcher. Compl. ¶ 9. Defendant Dr. Ellen Cohn was a post-doctoral student working in Dr. Chao's laboratory. Compl. ¶ 24. This dispute writ large originated with a series of research misconduct allegations that Dr. Chao and Dr. Cohn made against one another in 2007. Dr. Cohn claimed that in July, 2007, Dr. Chao asked her to misrepresent research

results by omitting certain data collected from experimental mice, switching other data, and using insufficient sample sizes and analysis. Essig Aff. Ex. E, at 2, 7. Dr. Chao claimed that Dr. Cohn had chosen to misrepresent data of her own and he had tried to stop her. Compl. ¶¶ 24, 26; Essig Aff. Ex. D, at 1, Ex. E, at 7-9. On the advice of a faculty advisor, Cohn consulted Dr. Gwen Randolph, who was collaborating with both parties on the disputed project. Dr. Randolph met with Dr. Chao and Dr. Cohn on July 26, 2007, but was ultimately unable to resolve their dispute over the appropriateness of switching and omitting certain data. Essig Aff. Ex. D., at 2., Ex. E, at 8. As a result, Dr. Cohn transferred out of Dr. Chao's laboratory on August 17, 2007, and began working instead with Defendant Dr. Liliana Ossowski.

On September 21, 2007, Cohn discovered that Dr. Chao was about to submit a manuscript to the journal Nature Medicine that included the allegedly misrepresented data that had given rise to her dispute with the Plaintiff. Dr. Cohn was concerned not just about the propriety of using the data, but also about the fact that she was named as the second author despite having done most of the underlying research and having been largely excluded from the writing and review process. Essig Aff. Ex. D, at 2. On September 25, 2007, Dr. Cohn met with Division Chief Atweh to voice these concerns. Atweh agreed to request that Dr. Chao not submit the manuscript, and arranged a meeting with Dr. Chao and Dr. Cohn for September 27, 2007.

On September 26, 2007, before that meeting could take place, Chao filed a complaint with MSSM's Research Integrity Officer, Defendant Reginald Miller ("RIO Miller"), alleging that Dr. Cohn had fabricated research data in an experiment conducted in January. Compl ¶ 27; Essig Aff. Ex. D, at 2. RIO Miller cautioned Chao that he was concerned the allegations were made for retaliatory reasons. Chao maintained that his complaint was well founded and he wished to press ahead. After commencing an informal preliminary review, RIO Miller determined that Dr. Chao's allegations could not be supported, and Dr. Chao withdrew his complaint. Compl ¶¶ 28-29; Essig Aff. Supp. Mot. Dismiss Ex. E, at 2. Cohn learned of this the next day and, on September 28, learned that Chao had submitted the manuscript without meeting with her.

On October 3, 2007, Cohn filed her own complaint with RIO Miller against Chao. Compl. ¶¶ 30-31. On November 20, 2007, Chao renewed his allegations of research misconduct against Cohn.

**Regulations governing research misconduct at MSSM**

When MSSM receives a complaint of research misconduct, it must investigate the allegations in conformity with two coextensive procedures. One is mandated by federal regulations applicable to institutions receiving federal Public Health Service ("PHS") funding, and falls within the jurisdiction

of the Office of Research Integrity ("ORI"), an independent entity within the U.S. Department of Health and Human Services. The other is mandated by MSSM's Faculty Handbook, which incorporates in large part the relevant federal regulations, and falls within the jurisdiction of MSSM's multi-tiered disciplinary review system described below. *See* MSSM Faculty Handbook, Ch. VI, Essig Aff. Ex. B; 42 C.F.R. § 93.300-319 (detailing "Responsibilities of Institutions").

In accordance with the MSSM Faculty Handbook, allegations of misconduct are reported to the Research Integrity Officer ("RIO"). *See* MSSM Faculty Handbook, Essig Aff. Ex. C, at 7. The RIO meets with the Research Integrity Committee ("RIC") to determine whether the allegations fit within the definition of research misconduct and/or trigger obligations under federal regulations, and assess whether the allegations are "sufficiently credible and specific" to merit further action. If further action is appropriate, the RIC may convene a standing Inquiry Panel ("the Panel"), which consists of at least three members and conducts an initial fact-finding inquiry into the alleged misconduct to determine whether a full investigation should be carried out. The accused faculty member may object to the composition of the Panel based on conflicts of interest. Within 60 days, the Panel must issue a report to the Deciding Officer, in this case the Dean, elaborating its findings and recommending whether to proceed to the "investigation stage." The accused faculty member receives a draft of the report and is entitled to respond and any response will be included in the final report to the Dean. Based on the final report, the Dean decides whether a formal investigation is called for, and must notify ORI within 30 days of his decision.

At the formal investigation stage, the RIC appoints a fact-finding committee (the "Investigation Committee"). The Investigation Committee is composed of research scientists and conducts "a thorough investigation." Its review must "encompass all significant issues identified during the course of the investigation," and "review all relevant documents and interview each person who has been reasonably identified as having relevant information." *Id.* It then issues a report to the Dean outlining its conclusions regarding research misconduct using a preponderance of the evidence standard. *Id.* at 10. *C.f.* 42 C.F.R. § 93.219. Once again, the accused must receive a draft and has access to evidence in order to respond. Any response will be considered in a final report to the Dean. Within 120 days the Dean must review the report and take any related action including disciplinary action. *Id.* at 10-11.

Any faculty member subject to disciplinary action is entitled to appeal to the Faculty Disciplinary Tribunal upon request to the chair of the faculty. *See* MSSM Faculty Handbook, Ch. VI,

Essig Aff. Supp. Mot. Dismiss Ex. C.[1] The Tribunal must hold a hearing within 20 days of a request and "examine all charges and allegations, hear testimony, question witnesses, inspect records and reports, call witnesses, and request the production of records and reports" and allow the faculty member to present relevant witnesses and evidence on his behalf. Testimony must be under oath, the hearing must be recorded stenographically, and both the Dean and Investigation Committee, whose determinations are being appealed, as well as the accused faculty member may be represented by counsel. *Id.* at 2. The Tribunal makes its findings based on "a preponderance of the evidence" standard, and if appropriate may recommend disciplinary action, including termination. *Id.* The Dean relays this report to the accused.

The Faculty Disciplinary Tribunal's findings may be appealed to the Board of Trustees. The Chair of the Board convenes an Appeals Board withat least three members from the Board of Trustees. The Appeals Board reviews the record below for: (a) fairness, and (b) a reasonable basis for the findings of the Tribunal and the actions of the Dean. This decision is final within MSSM. *Id.* at 2-3.

Apart from the MSSM process, ORI may respond separately and directly to any allegation of research misconduct. *See* 42 C.F.R. § 93.400-523; 42 U.S.C. § 216, 241, 289b. It may review an institution's findings and process, or conduct a separate investigation, make a separate finding of misconduct, and recommend separate disciplinary actions. § 93.400. In making its independent assesment of the allegations, ORI must considers whether they meet the definition of misconduct, whether they implicate PHS funding, and whether they are sufficiently specific. § 93.402.

**The inquiry and investigation into research misconduct**

*a. The initial inquiry into allegations of research misconduct*

After receiving the cross-complaints of research misconduct from Dr. Cohn and Dr. Chao, RIO Miller met with the RIC and determined that both complaints were sufficiently credible and specific to carry forward. He then convened an Inquiry Panel to review both complaints separately. Compl. ¶¶ 31, 39-40; Def.'s Mem. Supp. Mot. Dismiss 9; Pl.'s Mem. Opp'n Def.'s Mot. Dismiss 5; Essig Aff. Ex. E, at 2.

On December 6, 2007, the Inquiry Panel reviewed the complaint against Dr. Chao and prepared a report which it distributed first to Chao, and then to Defendant Dean Charney and ORI, recommending the commencement of an investigation. Compl. ¶¶ 40-43; Def.'s Mem. Supp. Mot.

[1] The Handbook's rules for composition of the Tribunal are detailed in Handbook Ch. III, not included in the Briefs. *See* MSSM Faculty Handbook, Ch. VI, Essig Aff. Supp. Mot. Dismiss Ex. C., at 2.

Dismiss 8. On February 25, 2008, the Inquiry Panel decided that certain allegations against Cohn were likewise sufficiently substantial to commence an investigation. The Panel distributed the second report to Cohn, and then to Dean Charney and ORI. On March 18, 2008, after reviewing the Panel's reports, Dean Charney informed ORI that he had determined that MSSM would proceed with an investigation into both allegations. Essig Aff. Ex. E, at 3.

*b. The formal investigation*

Based on ORI's recommendation for ensuring fairness, MSSM's formal investigation addressed both complaints as part of the same proceeding. Dean Charney appointed an Investigation Committee comprised of defendant faculty members Dr. Mlodzik, Dr. Snoeck, Dr. Krulwich, Dr. Vlassara, and Dr. Godbold. These members came from various divisions of MSSM. Compl. ¶ 39; Essig Aff. Ex. E, at 1. The Committee met first on April 14, 2008, and held 13 formal sessions between April 28, 2008, and March 13, 2009. At these sessions the Committee interviewed Dr. Cohn, Dr. Chao, Meagan Kelly (a lab technician who had worked with Dr. Chao), Dr. Randolph (who had collaborated with both complainants), Defendant Dr. Ossowski (who ran the lab that Dr. Cohn went to work in after her dispute with Dr. Chao), Dr. Christopher Walsh (Dr. Chao's mentor), Dr. Carl Nathan, and Dr. Atweh (the complainants' Division Chief). Compl. ¶¶ 41, 62; Essig Aff. Ex. E, at 4.

In early 2009, the Committee provided a draft report to Chao finding that he had committed research misconduct. Dr. Chao responded with comments and objections on February 11, 2009. On April 7, 2009, the Committee issued its final report to Dean Charney and to ORI, concluding that Chao had engaged in misconduct and failed to follow the "standards of good laboratory practice" (the "Report" or "Final Report"). Compl. ¶¶ 51, 55-57; Essig Aff. Ex. E. The Report included an addendum in which the Investigaiton Committee provided responses to Chao's comments and objections. Essig Aff. Ex. E. Addendum, at 2.

On May 7, 2009, Dean Charney terminated Chao's appointment to the faculty, based on the Committee's Final Report. Compl. ¶ 63; Essig Aff. Ex. F. Dr. Chao sought review of his termination before the Faculty Disciplinary Tribunal. On June 10, 2009, as part of his ongoing efforts to clear his name, Dr. Chao obtained a letter from Dr. Alan R. Price, a private consultant and former ORI official, in which Dr. Price argued that the Final Report was "inadequate, seriously flawed and grossly unfair in dealing with Dr. Chao." Moskowitz Aff. Ex. C.

**The ORI review**

The ORI's Division of Investigative Oversight ("DIO") reviewed the Final Report issued in both Chao's and Cohn's cases. In the fall of 2009, it informed RIO Miller that it was declining to recommend that ORI pursue findings of research misconduct in either case. Compl. ¶ 53; Moskowitz Aff. Ex. D; Essig Aff Ex. G; Pl.'s Mem. Opp'n Def.'s Mot. Dismiss 12-13. In announcing its decisions on each case, DIO used form language affirming the institution's authority to conduct its own investigation and make its own findings, according to its own particular standards. In pertinant part, it concluded the following:

> Based on the evidence provided by MSSM and during DIO's oversight review, ORI is declining to pursue findings of research misconduct in this case.
>
> In choosing not to pursue findings of research misconduct, ORI recognizes the authority of MSSM to independently set its own standards and make determinations of when staff have failed to meet the norms of behavior expected at the institution. ORI's administrative determination in this case does not diminish the authority of MSSM to draw its own conclusions about the scientific or professional misconduct [at issue].

Moskowitz Aff. Opp'n Mot. Dismiss Ex. D; Essig Aff. Supp. Mot. Dismiss Ex. G.

**The MSSM appeals process**

On November 19, 2009, the Faculty Disciplinary Tribunal affirmed Dr. Chao's termination. MSSM's Faculty Disciplinary Tribunal, convened by the Faculty Council and not the Dean, met for three sessions in 2009. It reviewed the claims, records and reports, and heard the testimony and cross-examination of several witnesses, including members of the Investigation Committee. Dr. Chao and Dean Charney were each represented by counsel. Compl. ¶ 65; Essig Aff. Ex. H. In affirming Dr. Chao's termination, the Tribunal found that the Investigation Committee's conclusions were substantiated by a preponderance of the evidence. Compl. ¶ 70; Essig Aff. Ex. H.

On December 16, 2009, Chao appealed the decision of the Faculty Disciplinary Tribunal to MSSM's Board of Trustees, which is independent of both the faculty and the Dean. Moskowitz Aff. Ex. B. The Chairman of the Board of Trustees appointed an Appeals Board consisting of three members of the Board of Trustees. Chao and Dean Charney were once again represented by counsel for these proceedings. On January 26, the parties made written submissions and on February 9, 2010, they made responses. On March 9, 2010, the Board heard oral arguments from both parties. On March 16, 2010, the Board rendered its decision to sustain Dr. Chao's termination, finding no basis to

overturn the Dean's action nor the decision of the Faculty Disciplinary Tribunal . Compl. ¶ 71; Essig Aff. Ex. I.

**The current action**

Following the decision of the Appeals' Board, Dr. Chao commenced the present civil action on April 2, 2010. Chao brings claims for defamation and other torts, arguing that statements made by the Defendants at various stages of the process caused injury to his reputation as well as the loss of his job, attorneys fees , emotional distress as a result of the process, and distraction from his research. In particular, Dr. Chao points to (1) statements made by Dr. Cohn and Dr. Ossowski in offering evidence during the inquiry and investigation phases; (2) statements made in the Investigation Committee's Final Report; (3) statements made by members of the Investigation Committee and Dean Charney while testifying before the Faculty Disciplinary Tribunal; (4) statements made by Dean Charney to the Appeals Board; and (5) statements made by MSSM that "Chao had been fired for data fraud."

**DISCUSSION**

A motion to dismiss brought under Rule 12(b)(6) will be granted if there is a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal on this ground, a plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While the court must "draw all reasonable inferences in the [non-movant's] favor," *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007), it need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 410 (S.D.N.Y. 2009).

A court may consider "undisputed documents, such as a written contract attached to, or incorporated by reference in, the complaint." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008); *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 190 (S.D.N.Y. 2009) (a district court deciding a motion to dismiss defamation claims "may consider documents attached to the complaint or incorporated by reference, such as the affidavits containing the allegedly actionable statements."). "[E]ven if not attached or incorporated by reference, a document upon

which the complaint *solely* relies and which is *integral to the complaint* may be considered" on a motion to dismiss. *Roth*, 489 F.3d at 509.

**1. Defamation (4th cause of action)**

A claim for defamation in New York must allege "(1) a false statement about the complainant; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on the part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Gargiulo*, 651 F. Supp. 2d at 192 (S.D.N.Y. 2009) (internal quotation marks removed) (*citing Dillon v. City of New York*, 261 A.D.2d 34, 38 (N.Y. App. Div. 1999)). "A statement that tends to injure another in his or her trade, business or profession is defamatory per se." *Fuji Photo Film U.S.A., Inc*, 669 F. Supp. 2d at 411.

Plaintiff's defamation claim is dismissed for two reasons. First, the allegedly defamatory statements made prior to April 2, 2009 are barred by the applicable one year statute of limitations. Second, all of the statements are protected by qualified privilege. Overcoming qualified privilege requires a showing of malice, which Plaintiff has failed to do.

**a. Statements made prior to April 2, 2009 are time-barred**

New York defamation claims are subject to a one year statute of limitations. *See* N.Y. C.P.L.R. § 215(3); *Firth v. State*, 775 N.E.2d 463, 464 (N.Y. 2002). The claim accrues on the date of publication of the allegedly defamatory statement. *Firth*, 775 N.E.2d at 464-65. This action was commenced on April 2, 2010, so any statement made prior to April 2, 2009 is time-barred and may not form the basis for a defamation claim by Dr. Chao. This precludes consideration of the statements made by Dr. Cohn in her complaint dated October 3, 2007, her testimony before the Investigation Committee throughout 2008, and Ossowski's testimony before the Investigation Committee on May 12, 2008.

**b. Statements made after April 2, 2009 are protected by privilege**

New York law recognizes both absolute and qualified privilege; while an absolutely privileged statement may not give rise to a defamation claim regardless of the speaker's intent, "[t]he shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice.'" *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992). The qualified privilege is defeated by either common law or constitutional malice. *Id.* at 437-38. Common law malice consists of statements published with "spite or ill will", and defeats qualified privilege "only if it is 'the one and only cause for the publication.'" *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 98 (2d Cir. 2000) (*citing Liberman*, 80 N.Y.2d at 439 ("If the defendant's statements were made [for a

legitimate, privileged purpose], it matters not that defendant *also* despised plaintiff. Thus, a triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication'") (internal citations omitted)). To show constitutional malice the plaintiff must demonstrate that the "statements were made with a high degree of awareness of their probable falsity." *Liberman*, 80 N.Y.2d at 438. "In other words, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication." *Id.* (internal citations omitted); *Fuji Photo Film U.S.A., Inc.*, 669 F.Supp.2d at 412. "The critical difference between common-law malice and constitutional malice, then, is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth." *Konikoff*, 234 F.3d at 99.

New York recognizes a "common interest" qualified privilege that protects communications "made by one person to another upon a subject in which both have an interest." *Liberman*, 80 N.Y.2d at 437. *See also Slue v. New York University Medical Center*, 409 F. Supp. 2d 349, 366 (S.D.N.Y. 2006) (*citing Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001)). The scope of the privilege is limited to those persons who share the interest, and will not protect communications to others. *Slue*, 240 F.3d at 367. The common interest privilege has been applied to communications among fellow employees, including faculty members. *See Stukuls v. New York*, 42 N.Y.2d 272, 280 (1977); *Slue*, 409 F. Supp. 2d at 366. In *Slue*, the plaintiff, a doctor employed by NYU Medical School, brought defamation claims on the basis of statements made by his colleagues indicating that he had been terminated for taking inappropriate pictures of patients. *Slue*, 409 F. Supp. 2d at 366-67. This Court found that the common interest privilege defeated the defamation claims because "[b]y virtue of their employment with NYU Medical School, [the individuals to whom the statements had been published] had an interest in the details of Slue's discharge." *Id.* at 367.

Qualified privilege also attaches when the speaker believes he has a duty to make the communication, "though the duty be not a legal one, but only a moral or social duty of imperfect obligation." *Slue*, 409 F. Supp. 2d at 367 (*citing Shapiro v. Health Ins. Plan of Greater N.Y.*, 7 N.Y.2d 56, 60 (1959)).

The allegedly defamatory statements that are timely in this case include (1) statements made in the Investigation Committee's Final Report that were published to Defendant Charney, the Faculty Disciplinary Tribunal, and ORI (Am. Compl. ¶ 55-62); (2) statements made by Defendant Mlodzic while testifying before the Faculty Disciplinary Tribunal, which in turn published them to the MSSM

Board of Trustees (Am. Compl. ¶ 66); (3) statements made by Defendant Snoeck while testifying before the Faculty Disciplinary Tribunal, which in turn published them to the MSSM Board of Trustees (Am. Compl. ¶ 67); (4) statements made by Defendant Charney while testifying before the Faculty Disciplinary Tribunal and before the MSSM Board of Trustees (Am. Compl. ¶68-69); (5) statements made by MSSM via its counsel Sally Strauss in March and April of 2010 during meetings with several members of MSSM's Hematology-Oncology department, indicating that Dr. Chao had been fired for data fraud, and that his research suffered from multiple problems (Am. Compl. ¶ 72-74).

The parties argue at length as to whether absolute privilege attaches to these statements. I decline to consider these arguments because Plaintiff concedes that these statements are subject to qualified privilege and I conclude that qualified privilege alone provides grounds for dismissal. As described below, Plaintiff's allegations of malice constitute "[l]egal conclusions, deductions or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d at 95. Plaintiff has failed to show that either constitutional or common law malice overcomes the privilege because the statements were all made as part of carefully-conducted investigation and disciplinary proceeding that involved a multi-level review process and was required by institutional and federal regulations. Plaintiff points to a number of facts that he argues indicate malice, and they are addressed in turn as follows.

**i. Testimony in support of Dr. Chao's character**

Plaintiff argues that the Investigation Committee's Report that concluded that he committed misconduct and promoted a laboratory culture of misconduct and authoritarianism was published with constitutional malice. According to him, the Committee had a high degree of awareness of the probable falsity of its conclusions because it had heard testimony that did not support those conclusions. In particular, Plaintiff's lab technician, Ms. Kelly, who had worked in his lab for three years, testified that she "never felt pressured to make up things . . . and show [Plaintiff] what he wanted to hear . . ." Am. Compl. ¶ 59. In addition, Dr. Walsh testified in support of Plaintiff's integrity and professionalism. *Id.* ¶ 61.

These facts are far from sufficient to show that the Investigation Committee acted with constitutional malice. Ms. Kelly's assertion that she never felt pressured by the Plaintiff does not prove the probable falsity of other testimony to the contrary, nor discredit the Investigation Committee's findings made following an investigation that lasted 11 months, met at least13 times, reviewed voluminous records, and interviewed 8 witnesses. Dr. Walsh's testimony was mixed, and

while he testified in support of Plaintiff's integrity and professionalism, he also provided testimony that supported the Investigation Committee's findings. *See* Essig Aff. Ex. E at 12. The Investigation Committee compiled a storehouse of evidence, and the fact that some of the testimony by 2 witnesses did not support its conclusion cannot be the fulcrum by which Plaintiff's research misconduct is excused. *See Fuji Photo Film U.S.A., Inc*, 669 F. Supp. 2d at 412.

**ii. The Investigation Committee's choice of witnesses**

Plaintiff charges that the Committee's determination not to interview certain of the witnesses that he identified supports a finding of malice. Consistent with the MSSM Faculty Handbook and federal regulations, the Investigation Committee was required to interview witnesses "reasonably identified as having information regarding any relevant aspects of the investigation, including witnesses identified by the respondent", and to pursue "all significant issues and leads discovered that are determined relevant to the investigation." 42 C.F.R. § 93.310(f)-(h); Essig Aff. Ex. B, MSSM Faculty Handbook, Chapter VI (B)(9). The Investigation Committee thus had discretion to make determinations as to what was "relevant" and "significant" and that is precisely what it did. *See* Essig Aff. Ex. E, Report, Addendum at note 1. These facts simply do not indicate that ill will or spite was the Investigation Committee's sole motivation in its determinations, *see Konikoff*, 234 F.3d at 98, particularly in light of the fact that it was acting pursuant to its obligations under the MSSM Faculty Handbook and federal regulations.

**iii. Content of the Investigation Committee Report**

As evidence of malice, Plaintiff also points to both the scope and content of the Report. He argues that statements related to his credibility, honesty and professionalism, as well as the inclusion of topics such as sample size, presence of statistical analysis, and order of authorship, were outside the scope of the inquiry, and therefore spite or ill will must have been the sole cause for their publication. On the contrary the objected to statements were within the appropriate scope of the investigation and provided relevant information that supported the Committee's findings, as required by federal regulations.

The scope of the investigation encompassed the general conduct of research in Plaintiff's lab. In convening the Investigation Committee, Dean Charney, consistent with his authority and obligations under federal regulations, wrote to ORI to inform it of the investigation, and to say that, as Dean of MSSM he had "determined that the scope of the investigation should include the general conduct of research within Dr. Chao's laboratory." *See* Letter to John E. Dahlberg, PhD., Director Division of Investigative Oversight and Associate Director, Office of Research Integrity, from Dean

Charney, dated March 18, 2010. Plaintiff notes that this letter "provides additional evidence that defendants expanded the investigative process beyond what was required by 42 C.F.R 93." This expansion was consistent with the Dean's authority, as recognized by ORI. *See, e.g.*, Moscowitz Aff., Ex. D. The expanded scope was a legitimate inquiry into the background of the allegations and the general conduct of research at MSSM, which is an appropriate subject for the Dean's professional concern. Indeed, the legitimacy of the expanded scope of the inquiry was affirmed by the Faculty Disciplinary Tribunal, which on Chao's appeal affirmed that he had violated the "standards of good laboratory practice," Essig Aff. Ex. H at 2, a charge separate from the research misconduct charge reflected in 42 C.F.R. 93. The expanded scope of investigation does not evidence ill will or spite, nor do the statements made in the Investigation Committee's Report explaining and supporting its conclusions.

The Report's content provided appropriate background facts supporting its conclusions. The rules governing the Investigation Committee required it to include in its report, among other things, a summary of "the facts and the analysis which support the conclusion." 42 C.F.R. § 93.313(f)(2). Although Plaintiff characterizes the Report's findings as "character assassination", the statements addressed to his professionalism or lack of it are directly related to the question of his research misconduct. In particular, he points to the following statements that he:

- was "remarkably ignorant about the details of his protocol and the specifics of his raw data"
- was "willing to use sloppy data; selective data and manipulated data in order to support his thesis and generate his papers for publication"
- had a "general willingness to use selective data and omit inconsistent data"
- "[demonstrated] an overall pattern of excluding data that did not conform to his hypothesis"
- was willing "to rush to scientific conclusions without a full command of the underlying data"
- promoted "a laboratory culture of misconduct and authoritarianism by rewarding results consistent with his theories and berating his staff if the results were inconsistent with his expectations."

Am. Compl. ¶¶ 55, 57; Essig Aff. Ex. E, Investigation Report at 4-5, 14. While certainly negative, these comments are directed to his research habits and provided relevant background information supporting the Committee's finding of misconduct, as required by 42 C.F.R. § 93.313(f)(2).

Similarly, the statements addressed to Plaintiff's credibility and honesty exhibit a highly negative assessment, but do not evidence malice or ill will. They provide relevant background information supporting the Investigation Committee's conclusions, and were motivated at least in

part by the Investigation Committee's stated concern that Plaintiff had not been forthright in the investigation process. *See* Essig Aff. Ex. E, Investigation Report at 14. The statements highlighted by Plaintiff as defamatory and exhibiting malice include that he:

- "often claim[ed] a lapse in memory when his testimony would have otherwise undermined his position"
- "use[d] his memory lapses as a shield to avoid accepting responsibility for his lapses in oversight"
- "lack[ed] credibility"
- "fail[ed] to be forthright during the investigation"
- "[was] cavalier with his selective memory"

Am. Compl. ¶¶ 55-57. These statements too provide background information supporting the conclusion that Plaintiff was willing to use selective facts. Moreover, they are relevant to the Investigation Committee's concern for the integrity and reliability of its own proceedings.

The statements finding that Plaintiff used small sample sizes and failed to perform statistical analysis may not have been necessary to a finding of research misconduct as defined by ORI, but again provide relevant background information and are well within the expanded scope of the investigation into the general conduct of research within Plaintiff's laboratory. The inclusion of these observations was directly related to the investigation and does not provide evidence that ill will or malice was present, let alone that it was the sole factor motivating the Investigation Committee's statements. *See Konikoff*, 234 F.3d at 98. While it is understandable that plaintiffs never applaud alleged defamation, nonetheless their dislike for the findings does not make them actionable.

**iv. The comment regarding Dr. Chao's authoritarian character**

The Amended Complaint notes that during the investigation, it was said that Plaintiff's allegedly authoritative nature was due to his Chinese background and "cultural" differences. Am. Comp. ¶ 50. This comment, if it occurred at all, was inappropriate, regrettable and without any justification or utility in the context of the investigation into research misconduct. It evidences ignorance and latent racism on the part of the speaker. However, Plaintiff has not attributed the comment to a particular individual nor pleaded it as a basis for his defamation claim.

**v. ORI's determination not to pursue findings of misconduct**

Plaintiff asserts as evidence of malice the fact that the proceedings occurred despite ORI's decision not to pursue findings of research misconduct. This argument fails because ORI's determination does not amount to a finding that no research misconduct occurred, and ORI

determination did not in any way diminish MSSM's authority to make its own findings of misconduct pursuant to its own process, as expressed by ORI itself. *See* Compl. ¶ 53.

The ORI determination does not vindicate Dr. Chao. The criteria ORI applies when determining whether to open a case include (1) whether the misconduct alleged involved or related to an application for Public Health Service (PHS) funds; (2) whether the conduct met the definition of research misconduct in 42 C.F.R 93; and (3) whether there was sufficient information about the alleged research misconduct to proceed with an inquiry. 2008 ORI Annual Report, Part I, Responding to Research Misconduct Allegations at 1.

Because the allegations did relate to an application for PHS funds, Plaintiff reasons that ORI's determination must have been based on its conclusion either that Plaintiff's actions did not meet the definition of research misconduct or that the allegations did not contain sufficient information to proceed. However, the ORI letter to Defendant Miller is silent as to the reasons for ORI's determination not to pursue findings, and made it clear that ORI "recognizes the authority of MSSM to independently set its own standards and make determinations of when staff has failed to meet the norms… [and ORI's] administrative determination does not diminish [that authority]." Compl. ¶ 53.[2] Indeed, the Report made findings not just of research misconduct, but also of a failure to follow the standards of good laboratory practice, and this was affirmed by two independent review bodies convened by two independent authorities. *See* Essig Aff. Exs. H at 2; I at 6. Thus, even if ORI and MSSM ultimately came to contrary views on whether a violation was committed, this fact does not give rise to an inference that MSSM's findings were motivated by ill will or malice.

**vi. Dr. Price's criticism of the Investigation Committee Report**

Dr. Price, a former chief research misconduct investigator at ORI, prepared a letter on June 10, 2009 in which he asserted that the Investigation Report was "inadequate, seriously flawed and grossly unfair in dealing with Dr. Chao." Moskowitz Aff., Ex. C at 3. Plaintiff argues that this supports his allegations of malice.[3] If the Report was "grossly unfair in dealing with Dr. Chao" that

[2] MSSM's Faculty Handbook incorporates the definition of research misconduct found under 42 C.F.R § 93.103. *See* MSSM Faculty Handbook, Essig Aff. Supp. Mot. Dismiss Ex. C, at B(3).

[3] In considering Dr. Price's comments as part of the allegations on a motion to dismiss, the Court is not evaluating their weight nor reviewing the Investigation Committee's findings. However, in carefully examining whether the facts available to the Court as part of the allegations suggest the existence or pervasiveness of malice, it nonetheless bears mentioning that Dr. Price's comments are not entirely persuasive. First, he gave his opinion not in his official capacity, but as a private consultant, and in a letter to an attorney whose connection to this case is undisclosed. Second, although Dr. Price predicted that ORI would note the Report's shortcomings and perhaps require the Investigation Committee to readdress certain issues, ORI did not mention any shortcomings in the Report. In addition, two MSSM institutional bodies, both independent of the Investigation Committee, formally reviewed the Report and affirmed its findings and

could lead to a reasonable inference of spite or ill will. However, it does not vitiate the fact that, as noted above, the Investigation Committee was acting pursuant to an interest common to all concerned, and was obligated by the MSSM Faculty Handbook and federal regulations to conduct the investigation and issue the Report. This defeats any allegation that spite or ill will was the sole motivating factor here, *see Konikoff*, 234 F.3d at 98, qualified privilege remains undisturbed and the defamation claim is dismissed.

**2. Other Tort Claims**

Where tort claims essentially restate a defamation claim that has been dismissed on a motion to dismiss, the tort claims must also be dismissed. *See O'Brien v. Alexander*, 898 F. Supp. 162, 172 (S.D.N.Y. 1995) (Chin, J.) (dismissing claims for injurious falsehood, negligence and general tort where they were duplicative of the defamation claim dismissed on the basis of privilege). Under New York law, tort claims are construed as defamation claims not just when they "seek damages only for injury to reputation, but also where the entire injury complained of by plaintiff flows from the effect on his reputation." *Jain v. Securities Indus. and Fin. Markets Assoc.*, No. 08 Civ. 6463, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009) (*citing Goldberg v. Sitomar, Sitomar & Proges*, 469 N.Y.S.2d 81, 82 (App. Div. 1983), *aff'd* 63 N.Y.2d 831, 482 (1984)); *Riddell Sports Inc. v. Brooks*, 872 F.Supp. 73, 76 (S.D.N.Y. 1995) (dismissing on the grounds that the "one year [defamation] limitations period [applies] despite the labels which counterplaintiffs apply to their [injurious falsehood] claims" since the essence of the claimed injury was one to reputation).

In *Jain* the gravamen of plaintiff's alleged injury in each of her non-defamation claims either was harm to her reputation or harm that flowed from the alleged effect on her reputation, and the court found that this included her termination from employment, the resulting loss of income and benefits, her inability to find additional work, damage to physical health, and legal expenses. *Id.* Thus the rule applies broadly and even where "plaintiff takes care not to state that the damages are the result of injury to his reputation." *O'Brien*, 898 F. Supp. at 172.

**a. Injurious Falsehood/Trade Libel (5th cause of action)**

This cause of action relies on the same statements and the same damages as alleged in the defamation cause of action. Plaintiff claims that the two-year investigation process caused him injury beyond reputational harm, including the cost of attorneys throughout the process, injury to his ability to focus on his research, emotional distress, and his ultimate termination. These damages all flow

procedural fairness. These factors cast doubt on Dr. Price's conclusions and dampen the reasonableness of inferring that any malice was present here at all.

from the effect of the allegedly defamatory statements and this cause of action is dismissed on the same grounds as the defamation claim. *See Jain*, 2009 WL 3166684, at *9.

Even were the damages separable, Plaintiff has failed to adequately allege a claim for trade libel or injurious falsehood, which requires the "knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relation with others, to its detriment." *Kasada, Inc. v. Access Capital, Inc.*, 01 Civ. 8893 (GBD), 2004 WL 2903776, at *15 (S.D.N.Y. Dec. 14, 2004) (*citing Global Merch., Inc. v. Lombard & Co.*, 234 A.D.2d 98, 99 (1st Dep't 1996). Despite Plaintiff's allegation that the statements at issue "were calculated to interfere with his employment with Mount Sinai/MSSM and to prevent others from employing him," Am. Compl. ¶ 120, he has failed to show malice and failed to allege any facts plausibly giving rise to a reasonable inference of such inrtentional calculation on the part of Defendants. *See Iqbal*, 129 S.Ct. at 1949. Here as elsewhere he has failed toovercome the fact that the defendants were acting pursuant to a legal obligation to investigate research misconduct.

**b. Tortious interference with contract (1st cause of action)**

This claim too is duplicative of the defamation claim; it alleges the same injuries noted above which flow from the allegedly defamatory statements and it must be dismissed on the same grounds. *Jain*, 2009 WL 3166684, at *9.

Moreover, Plaintiff fails to state a claim. "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a "third party" had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001). Plaintiff has not shown any facts suggesting that Defendants employed wrongful means in the alleged interference; indeed all the investigatory work and all the testimony was conducted pursuant to obligations established in the Faculty Handbook and ORI regulations.

Plaintiff argues that the Investigation Committee did not include exculpatory evidence in its Report, did not interview all individuals requested by Plaintiff to be interviewed, and charges that false statements were made. His allegations lack specificity: the allegations of false statements are apparently sweeping references to all charges of misconduct brought against him, but while he repeatedly accuses the Defendants of false statements he alleges no facts that give rise to a reasonable inference that any particular statement was false. *See Iqbal*, 129 S.Ct. at 1949. His argument concerning the exclusion of exculpatory evidence is unpersuasive because he points to none which was excluded, nor does he point to the source of any obligation to interview all witnesses he

identified. The suggestion that this conduct amounts to wrongdoing intended to procure a breach of contract is particularly unpersuasive in light of the fact that the investigative record did contain testimony that was favorable to Dr. Chao, all of which was considered not just by the Investigation Committee but also by the Faculty Disciplinary Tribunal. *See* Essig Aff., Ex. H at 2.

**c. Tortious interference with prospective business advantage (2nd cause of action)**

Like the previous claims, this is duplicative of the defamation allegations because the injury is measured only by the harm to Plaintiff's reputation, and "Plaintiff is not permitted to dress up a defamation claim as a claim for intentional interference with a prospective economic advantage." *Krepps v. Reiner*, 588 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (dismissing a claim for tortious interference with prospective business advantage where it was based on an allegedly defamatory letter that the court found insufficient to state a cause of action for defamation).

Additionally, Plaintiff fails to state a claim. A New York claim for interference with a prospective economic advantage requires a Plaintiff to prove that "(1) the plaintiff had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Pasqualini v. MortgageIT, Inc.*, 498 F.Supp.2d 659, 669 -670 (S.D.N.Y. 2007) (*citing Am. Nat'l Theatre & Academy v. Am. Nat'l Theatre Inc.*, No. 05 Civ. 4535, 2006 U.S. Dist. LEXIS 69420, at *5 (S.D.N.Y. Sept. 27, 2006). First, the sole purpose of Defendants' conduct could not have been to harm Plaintiff, because they acted at least in part pursuant to obligations imposed by the Faculty Handbook and ORI regulations. Second, there was no intentional and malicious interference with a business relationship. Plaintiff has not alleged that Defendants' directed any conduct to third parties to prevent them from entering into a business relationship with Plaintiff. This element too is defeated by the fact that Defendants simply pursued their duties as required by law, and Plaintiff alleges no facts that suggest that they acted solely with malice.

**d. Prima facie tort (3rd cause of action)**

"[W]here the factual allegations underlying the prima facie tort cause of action relate to the dissemination of allegedly defamatory materials, that cause of action must fail." *McKenzie v. Dow Jones & Co.*, 355 Fed. App'x 533, 536 (2d Cir. 2009). Plaintiff's claim for prima facie tort is based solely on defendant Cohn's alleged dissemination of false statements in the 2007 letter that initiated the investigation and in subsequent communications in connection with the investigation. As such,

the claim relates only to defamatory allegations and must fail. *See McKenzie*, 355 Fed. App'x at 536; *Springer v. Viking Press*, 457 N.Y.S.2d 246, 248 (App. Div. 1982) (in case involving allegedly libelous depiction of plaintiff in novel, there was "no warrant for the invocation of the prima facie tort doctrine" where plaintiff could not succeed "without, at the same time, establishing the classical tort of libel").

Plaintiff claims that he has alleged injurious conduct beyond Cohn's dissemination of false statements, and points to his allegations that she fabricated data, falsified lab notes, and initially denied any wrongdoing. However, these allegations fail for two reasons. First, Plaintiff does not spell out how Dr. Cohn's alleged research misconduct harmed him. Second, "New York courts have been very strict in holding that a cause of action for prima facie tort will not lie unless the actions complained of can be plausibly said to have been motivated *solely* by malice towards the plaintiff." *McKenzie*, 355 Fed. App'x at 536 (emphasis in original). Again, Plaintiff nowhere alleges that Cohn's alleged misconduct was motivated solely by an intent to injure him.

**3. Claims against Mount Sinai Hospital and Mount Sinai Medical Center**

Defendants argue that all claims against Mount Sinai Hospital and Mount Sinai Medical Center (the "Mount Sinai Entities") should be dismissed because those entities are separate and apart from Plaintiff's employer, MSSM. They cite *Leung v. New York University*, which dismissed claims against New York University ("N.Y.U.") where plaintiffs were employed by New York University Medical Center, and had failed to show that N.Y.U. "engaged in, condoned, or in any way participated in the allegedly unlawful actions" or "that N.Y.U. was their employer at the time the alleged unlawful acts occurred." *Leung*, 2010 WL 1372541, at *9-10. That decision addressed Title VII claims, and affirmed that N.Y.U. could not be held liable for allegations against the Medical Center "based solely on common ownership." *Id.* at *9.

In pressing his defamation claims against the Mount Sinai entities, Plaintiff maintains that he was an employee of the Mount Sinai Entities because he was listed as such on his employment benefits form. He also asserts that the Mount Sinai Entities can be held liable for allegations against MSSM because they share the same legal, human resources, security, finance and other departments, and have integrated web sites. At the motion to dismiss stage credence must be given to the Plaintiff's position. While it probably makes no difference to keep them in the lawsuit since MSSM surely has the funds to cover any judgment, Plaintiff has alleged sufficient facts to raise a reasonable inference that, unlike in *Leung*, the Mount Sinai entities are connected and will not be dismissed at this stage of the proceedings.

## CONCLUSION

For the foregoing reasons Defendants' allegedly defamatory statements are either outside the applicable statute of limitations or protected by qualified immunity, and Plaintiff's defamation claim is dismissed. The other tort claims, including injurious falsehood/trade libel, tortious interference with contract, tortious interference with prospective business advantage, and prima facie tort, are duplicative of the defamation claim and in any case Plaintiff has failed to allege sufficient factual content to sustain them. Those claims are likewise dismissed. The Mount Sinai Entities remain defendants, and Plaintiff may proceed on his sixth through eleventh causes of action, which have not been challenged in this motion.

The Clerk of the Court is instructed to close this motion and remove it from my docket.

**SO ORDERED**
**December 17, 2010**
**New York, New York**

**Hon. Harold Baer, Jr.**
**U.S.D.J.**