```
STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
HENGJUN CHAO, M.D.,                      :
                                         :
       Plaintiff,                        :
                                         :        10 CV 2869 (HB)
       - against -                       :
                                         :        OPINION &
THE MOUNT SINAI HOSPITAL, et al.         :        ORDER
                                         :
       Defendants.                       :
---------------------------------------------------------------x
```

**Hon. Harold Baer, Jr., District Judge:**

Plaintiff Dr. Hengjun Chao, a medical researcher formerly employed by defendant Mount Sinai School of Medicine ("MSSM"), brought this action following his termination for research misconduct. His first five causes of action were dismissed in an Opinion and Order dated December 17, 2010. Defendants now seek summary judgment dismissing Chao's remaining claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and discrimination on the basis of race and national origin in violation of Title VII, New York State and City law, and 42 U.S.C. §1981. For the reasons that follow, the motion for summary judgment is GRANTED.

An extensive review of the background of this case is available in this Court's Opinion and Order on Defendants' motion to dismiss. *See* No. 10 Civ. 2869 (HB), 2010 WL 5222118 (Dec. 17, 2010). Because the relevant facts are discussed throughout this Opinion, a brief synopsis of events will suffice here. On October 3, 2007, Defendant Dr. Ellen Cohn submitted a complaint of research misconduct against Chao to MSSM's research integrity officer, Dr. Reginald Miller. Pursuant to MSSM policy, Dr. Miller met with MSSM's research integrity committee and determined that the complaint was sufficiently credible and specific to carry forward. He then convened an Inquiry Panel. Compl. ¶¶ 31, 39-40. On December 6, 2007, the Inquiry Panel reviewed the complaint against Chao and recommended the commencement of a formal investigation. Compl. ¶¶ 40-43. Defendant Dean Charney appointed an Investigation Committee ("Committee" or "Investigation Committee") comprised of Defendant faculty members Dr. Mlodzik, Dr. Snoeck, Dr. Krulwich, Dr. Vlassara, and Dr. Godbold. These members came from various divisions of MSSM. Compl. ¶ 39. The Committee held 13 formal

1

sessions in which it interviewed a variety of witnesses. Compl. ¶¶ 41, 62. The Committee provided a draft report to Chao, who responded with comments and objections on February 11, 2009. On April 7, 2009, the Committee issued its final report to Dean Charney. ("Report" or "Final Report"). The Report concluded that Chao had engaged in misconduct and failed to follow the "standards of good laboratory practice", and recommended an unspecified form of disciplinary action. On May 7, 2009, Charney terminated Chao's appointment to the faculty, based on the Committee's Final Report and his authority as Dean of MSSM. Compl. ¶ 63.

Chao sought review of his termination before MSSM's Faculty Disciplinary Tribunal ("Faculty Tribunal"). The Faculty Tribunal was convened by the Faculty Council, not the Dean, and was comprised of five doctors: Dr. Landrigan, Dr. Asbell, Dr. Laitman, Dr. Magid, Dr. Palese. Essig Aff. Ex. H. On November 19, 2009, the Faculty Tribunal affirmed Chao's termination. Chao appealed the decision of the Faculty Tribunal to MSSM's Board of Trustees. The Chairman of the Board of Trustees appointed an Appeals Board ("Trustees Appeals Board") consisting of three members of the Board of Trustees: George J. Grumbach, Blaine V. Fogg, and Bernard W. Nussbaum. Essig Aff. Ex. I. On March 16, 2010, the Board rendered its decision to sustain Chao's termination. Chao now seeks relief in this Court.

## DISCUSSION

### 1. Summary Judgment Standard

Summary judgment is warranted if the moving party shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009); Fed. R. Civ. P. 56(c). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007). "[T]he opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 224 (2d Cir. 2006) (*quoting* Fed.R.Civ.P. 56(e)). *Id.*

### 2. The breach of contract and the implied covenant of good faith and fair dealing

Plaintiff's contract-related claims charge a failure on MSSM's part to abide by its own policies and procedures. In New York, "claims based upon the rights or procedures found in college manuals, bylaws and handbooks may only be reviewed by way of an Article 78 proceeding. *Bickerstaff v. Vassar Coll.*, 354 F. Supp. 2d 276, 283 (S.D.N.Y. 2004), *aff'd*, 160 F. App'x 61 (2d Cir. 2005) (*citing Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92, 699 N.Y.S.2d 716

(1999)).  Defendants point out that the four-month statute of limitations applicable to Article 78 proceedings – which began to run with Chao's termination on May 7, 2009 – expired even before commencement of this action on April 2, 2010, so both the contract claim and the good faith claim are time barred.  *Id.* (dismissing state-law claim based on failure of a college to comply with its own procedures on the ground that the time to bring an Article 78 proceeding had expired); C.P.L.R. 217.

Although styled a breach of contract claim, Chao's claim turns on whether Defendants complied with their own disciplinary and termination procedures.  While Chao does not clearly identify what agreement was allegedly breached, at oral argument he relied on a one page letter, dated June 22, 2007, which reappointed him as an Assistant Professor of Medicine through June 30, 2011.  His theory appears to be that this letter amounts to a contract, and Defendants breached it by terminating him prior to June 30, 2011.  However, the letter, while not a contract to begin with, never mentions termination.  Strauss Decl. Ex. 10.

The MSSM Faculty Handbook (the "Handbook"), on the other hand, does outline the procedures for discipline and termination and Chao was made aware of its terms.  *See* Essig Aff. Ex. C; *see also* Def.'s 56.1 ¶ 12; Pl.'s. 56.1 Resp. ¶ 12; Strauss Decl. Ex 6.  His breach of contract claim is necessarily "based upon the rights or procedures found in" the Handbook, *Bickerstaff*, 354 F. Supp. 2d at 283, because any inquiry into whether his termination was proper vis-à-vis his employment agreement would turn on whether the termination proceedings were consistent with the Handbook.  As such, the contract claim in this action is unsustainable.  *Id.*; *see also Byerly v. Ithaca Coll.*, 290 F. Supp. 2d 301, 305 (N.D.N.Y. 2003), *aff'd*, 113 F. App'x 418 (2d Cir. 2004).

Chao's claim for breach of the implied covenant of good faith and fair dealing must be dismissed for the same reason.  It too is premised on allegations of improper disciplinary proceedings and termination.  *Compare* Am. Compl. ¶ 126 *with* Am. Compl. ¶ 130.  It too relies on alleged violations of the rights and procedures established in the Handbook.  Chao himself refers to the Handbook to show, for example, the presence of alleged bad faith and the unjustified termination.  *See* Pl.'s Mem. Opp. Mot. Summ. J. 4-18, 21-22.  As a result, the implied covenant claim is only reviewable in an Article 78 proceeding.  *See Byerly*, 290 F. Supp. 2d at 305.  Moreover, it must be dismissed for the independent reason that, as stated by the court in *Harris*, "the conduct allegedly violating the implied covenant is also the predicate for breach

of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2003); *OBEX Secs. LLC v. Healthzone Ltd.*, 10 Civ. 6876 (SAS) 2011 WL 710608 (S.D.N.Y. Feb. 28, 2011).

### 3. Discrimination based on race and national origin

Defendants move for summary judgment on all discrimination claims. Chao opposes the motion only with respect to his Title VII claim. While Chao's discrimination claims under New York City laws are subject to a lesser burden, Chao fails to argue that such claims survive Defendants' motion. Instead he devotes the bulk of his brief to mustering facts supporting an inference of discrimination. The lion's share of these facts focus on alleged differences between the Chao investigation and the Cohn investigation, and rehash the alleged problems with the proceedings that he argued previously in opposition to the motion to dismiss.

Whether or not Chao has waived his claims under New York City laws, the motion must be analyzed according to the "*McDonnell Douglas*" burden shifting analysis, as described below. *Gorzynski v. Jetblue*, 596 F.3d 93, 106 (2d Cir. 2010). Plaintiff must first make out a *prima facie* case by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491-492 (2d Cir. 2010). The same standard applies under New York State Human Rights Law. *Compare Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009) *and Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 (2004). While New York City Human Rights Law entails a slightly broader approach, *see Kumuga v. N.Y.C. Sch. Const. Auth.*, No. 127817/02, 2010 WL 1444513, *14 (N.Y. Sup. Ct. Apr. 2, 2010), in this case it does not ultimately compel a different result. A *prima facie* case gives rise to a presumption of unlawful discrimination, and the burden of production then shifts to the defendant to proffer a "legitimate, nondiscriminatory reason" for the challenged employment action. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir.2001). If the defendant is successful, "any presumption of discrimination arising with the *prima facie* case "drops from the picture" and Chao must show that the proffered reason is a mere pretext. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

### *(a) Prima facie case*

As a Chinese national, Chao is in a protected group, his qualification is not in issue, and his termination constitutes an adverse employment action.  Accordingly, to make a *prima facie* showing he need only show that his termination occurred "under circumstances giving rise to an inference of discrimination."  *Gorzynski v. Jetblue*, 596 F.3d 93, 106 (2d Cir. 2010).  Chao raises four points.

First, Chao alleges that Miller, the research integrity officer in charge of initiating the investigation into research misconduct, took notes in which he described the relevant parties as "Dr. Cohn/Chinese MD/Meagan Kelly."  Pl.'s 56.1 ¶ 1.  The force of this fact is mitigated by the fact that the reference to "Chinese MD" was used for the lab member whose name was then unknown to members of the Investigation Committee.  Def.'s 56.1 Resp. ¶ 1.  The reference was not actually directed to Chao, it was simply for identification purposes.

Second, MSSM's general counsel's office memorialized an Investigation Committee meeting held January 12, 2009, wherein there was a reference to Chao and to "cultural differences."  Pl.'s 56.1 ¶ 2.  While this could raise questions to the extent that "cultural differences" are understood as a proxy for differences in race and national origin, the notes are not attributed to a particular individual, nor is there any explanation for the single-line reference.

Third, on or around January 15, 2009, Defendant Dr. Helen Vlassara, a member of the Investigation Committee, characterized Chao as "possibly taught to obey and not question authority, not too unwilling to lie in order to advance his interests."  Pl.'s 56.1 ¶ 5.  These comments were made under the heading "Primary Education (foreign)," and Vlassara notes that Chao "never received a formal training in US."  Pl.'s 56.1 ¶ 6; Moskowitz Aff. Ex. A.  Further examination of Vlassara's statement makes clear that unlawful discrimination was not the motivation behind Chao's termination.  Her memorandum goes on to note that a "rising number of foreign post-docs [sic] trainees entering these insular labs are at risk of emerging from a faulty "incubator" ill prepared.  The same applies to native post-docs (as in E. Cohn's case)."  Def.'s 56.1 Resp. ¶ 6; Moskowitz Aff. Ex. A.  In a conclusion relating to both Chao and Cohn, Vlassara provides a better explanation of the concerns that motivated the investigation and resulted in the termination of both researchers: "The institution cannot afford to (and should not) get a blemished reputation, especially in today's climate. The Committee may have to be told whether this case is the 'tip of the iceberg' institution-wide prior to deciding whether to expand

5

or not on our recommendations." Moskowitz Aff. Ex. A.  This indicates that, far from a concerted, conspiratorial effort to fire Chao because of his race and national origin, the Committee in this case was concerned with maintaining MSSM's integrity as a research institution.

Fourth, Dr. George Atweh, a non-party who was formerly the chief of Chao's division at MSSM, made several questionable remarks in an interview on March 13, 2009 during the investigation process. *See* Straus Decl. Ex. 17.  He attributed Chao's alleged authoritarianism to his national origin. *Id.* at 33:15-18 ("I think that in part it's cultural, in China you never question authority . . ."); *id.* at 34:2-5 ("I counseled him on that, that that's no approach to run a laboratory, certainly not in this country, maybe in China, but not here . . ."); *id.* at 44:2-5 ("there are clearly issues with his ability to run a laboratory.  Conflicts with people; authoritarian issues, like we mentioned . . . [A]s I said, I think some of these are cultural . . ."). *See also* Pl.'s 56.1 ¶ 16; Def.'s 56.1 Resp. ¶ 16.

While these remarks demonstrate a speculative and naïve acceptance of stereotypes based on national origin, they do not suggest that discriminatory animus occasioned Chao's termination because Atweh was not even on the Investigation Committee, let alone involved in the decision to terminate Chao; in fact, the statements were made after Atweh was no longer employed by MSSM.  Straus Decl. Ex. 17 at 5:4-6.  Moreover, Chao has characterized Atweh as a friendly witness and the Investigation Committee agreed to interview Atweh at Chao's behest. *Id.* at 3:9-16.

Taken as a whole, these comments fail to show that Chao's termination occurred as a result of a racial or national origin bias.  Rather, Chao's behavior was independently objectionable, and no facts suggest that the unprofessional and unfortunate remarks by Chao's colleagues during the investigation had an effect on Dean Charney's termination decision.  The comments do not evidence the kind of animosity that has in other cases overcome summary judgment motions. *Cf. Jamieson v. Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 461-463 (S.D.N.Y. 2002).

Nevertheless, on summary judgment all inferences are drawn in favor of the non-moving party, and given the more lenient standard imposed by the City Human Rights law, I conclude that it is appropriate to at least continue on to the second step of the *McDonnell-Douglas*

analysis assuming, without deciding, that the remarks about Chao's race and national origin are sufficient to raise a *prima facie* case.

### *(b) Legitimate, nondiscriminatory reason for terminating Chao*

Even assuming Chao has established a *prima facie* case, his claim cannot survive.  Under *McDonnel Douglas* step two, Defendants must articulate a "legitimate, nondiscriminatory reason" for Chao's termination.  *McDonnell Douglas,* 411 U.S. at 802.  "In other words, '[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action.'"  *Bernard v. JP Morgan Chase Bank NA*, No. 10 Civ. 0710, 2011 WL 326513, *2 (2d Cir. 2011) (emphasis in original) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

Defendants easily meet this burden.  A voluminous record indicates a rigorously-investigated charge and finding that Chao committed research misconduct and violated professional or ethical standards.  "[I]if believed by the trier of fact", this would support a finding that Chao's termination was not the result of prohibited discrimination, and *McDonnell Douglas* requires no more.  *Bernard*, 2011 WL 326513, at *2.  Indeed, Chao's adherence to his professional standards is not in issue before this Court.  The decision to terminate Chao was based on the independent and legitimate grounds that he had deviated from the standards imposed upon him by his employer.

The complaints against Chao were numerous and suggested no discriminatory animus.  One colleague noted that "I was hopeful that Dr. Chao would be a good and rapid learner, but he proved not to be."  Pl.'s 56.1 ¶ 17.  In initial drafts of the Investigation Committee's report, Chao's colleague's described him as "inconsistent, vague, and evasive," *Id.* ¶ 66, and angry with an individual who "had the audacity to question his judgment."  *Id.* ¶ 69 (internal quotations omitted).  The report ultimately concluded that Chao had acted with reckless disregard and committed research misconduct.  *Id.* ¶ 85 (citing Report at 7-9 (Essig Aff. Ex. E)).  Vlassara noted her concerns about Chao's conduct as leader of a laboratory in a memorandum to other Committee members:

> There was evidently a large gap in the proper "maturation of Dr. Chao . . . A new group of young scientists suddenly came under his jurisdiction which, due to its leader's personality and lack of proper transitioning, immediately became isolated from all potential positive/educational

7

> influences. The group's division chief and collaborators did not pick up early enough nor respond[] to "unusual" signs and behaviors of [Dr. Chao]." Result: Possibly due to the absence of strong identifiable policies or role models, Dr. Chao's negative characteristics and work habits were re-enforced. As he suddenly became an 'authority', he tolerated no [dissent], made up the rules etc."

Moscowitz Aff. Ex. A.

The report itself noted behavior that indicates its concern with Chao's credibility and integrity:

> Dr. Chao's repeated unsubstantiated allegations and refusal to retract them despite the contrary evidence further undermined his credibility before the Committee. In fact, whenever Dr. Chao was confronted with documents or information that contradicted some of his statements or conflicted with his allegations . . . he would inevitably retreat to the position that he had no memory of reviewing the documents or discussing these issues with the relevant parties.
> . . .
> The Committee came to a unanimous impression that he was willing to use sloppy data, selective data and manipulated data in order to support his thesis and generate papers for publication.

Report at 5 (Essig Aff. Ex. E). At the end of the 15 page report detailing its findings and analyses, the Committee concluded that Chao "promoted a laboratory culture of misconduct and authoritarianism by rewarding results consistent with his theories and berating his staff if the results were inconsistent with hi expectations." *Id.* at 14. Although Chao continues to deny the underlying findings, it is undisputed that the Committee found that Chao (1) improperly directed Cohn to switch experiment results, which constituted research misconduct; (2) acted with reckless disregard for proper procedures by omitting certain data from charts in an article because the data conflicted with his hypothesis; (3) disregarded good laboratory practices by failing to use statistical analyses; (4) failed to comport with standards for scientific publication; and (5) retaliated against Cohn for questioning his authority and quitting his lab for another researcher's lab. Def.'s 56.1 ¶ 153; Pl.'s Resp. 56.1 ¶ 153.

In addition to unspecified disciplinary action, the Committee recommended that Chao be monitored, that tainted publications and abstracts be retracted, and that the institution provide improved guidance, training and oversight. In an addendum of 5 single-spaced pages, the

Committee reviewed Chao's objections to its report, found them unpersuasive, and reaffirmed its earlier findings and recommendations. Report at Addendum (Essig Aff. Ex. E). The Committee issued its Final Report on April 8, 2009.

On May 7, 2009, Dean Charney made the decision to terminate Chao's appointment to the faculty based on the Final Report. Def.'s 56.1 ¶ 168; Pl.'s Resp. 56.1 ¶ 168. Chao made two successive appeals to higher bodies within MSSM, and the termination decision was twice reviewed and affirmed. First, the Faculty Tribunal reviewed the record and heard new testimony and cross-examination; Chao had legal counsel who made written submissions, but the Faculty Tribunal found them unconvincing and ultimately affirmed the termination. Def.'s 56.1 ¶¶ 181-86; Pl.'s Resp. 56.1 ¶¶ 181-86. Second, Chao was represented by counsel before an Appeals Board of the Board of Trustees; the Trustees Appeals Board reviewed the findings below, received written submissions from the parties, and sustained the termination. *Id.* ¶¶ 189-203. These facts establish a "legitimate, nondiscriminatory reason" for Chao's termination, *McDonnell Douglas,* 411 U.S. at 802, and make clear that the ultimate termination decision was not tainted by discrimination.

### *(c) Pretext*

Because Defendants met their burden of showing a nondiscriminatory reason for Chao's termination, Chao must "establish that the defendant's proffered reason is a mere pretext" and that "more likely than not discrimination was the real reason for the employment action." *Bernard*, 2011 WL 326513, at *2. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.*

Several factors suggest that none of the remarks are sufficient to support an inference that Chao's termination was occasioned by discriminatory animus. First they are "stray" remarks buried within hundreds if not thousands of pages of testimony and reports. Further, non of them are attributed to Dean Charney, the person responsible for making the termination decision. *See Ross v. Local 110*, No. 91 Civ. 6367 (LAP), 1995 WL 351462, at *13 (S.D.N.Y. June 9, 1995), *aff'd*, 100 F.3d 944 (2d Cir. 1996). It is undisputed that, while the Investigation Committee recommended that Charney take some disciplinary action against Chao, it did not recommend termination, and such a recommendation would have been beyond its "purview." Def.'s 56.1 ¶ 155-56; Pl.'s 56.1 Resp. ¶ 155-56. The termination decision was Charney's alone, *see* Def.'s 56.1 ¶ 162; Pl.'s 56.1 Resp. ¶ 162, and no evidence suggests that Charney was

responsible for any improper remarks.  Additionally, none of the remarks occurred later than March of 2009 and the termination decision was not made until May 7, 2009, making it somewhat remote in time from the alleged discriminatory comments.  There was significant distance between the individuals who made the challenged remarks and Dean Charney – who made the termination decision – in terms of both time and institutional hierarchy.  *See Ross*, 1995 WL 351462, at *13.

Importantly, as noted above Charney's May 7, 2009 termination decision was reviewed by two successive bodies: on November 19, 2009, the Faculty Tribunal sustained the termination, and on March 16, 2010, the Trustees Appeals Board did the same.  *See* Def.'s 56.1 ¶¶ 186, 203; Pl.'s 56.1 Resp. ¶¶ 186, 203.  The panels that successively reviewed and affirmed the termination were even further removed in terms of time and institutional hierarchy from the challenged comments.  Chao makes much of the fact that his retained expert, Dr. Allen Price, criticizes the investigation process and termination decision.  However, Price's opinion, weighed against the considered finding of three successive decision-makers, is insufficient to establish that the finding of research misconduct was "a mere pretext" and that "more likely than not discrimination was the real reason" for Chao's termination.  *Bernard*, 2011 WL 326513, at *2.

Chao also points to a number of differences between the investigation of Chao and the investigation of Cohn in support of his argument that discrimination infected the process.  He emphasizes that while Chao was terminated, Cohn resigned voluntarily.  These arguments are unpersuasive because the investigations were similar, and both ultimately produced the same result.  The Investigation Committee found that both individuals had committed misconduct, and both individuals should be disciplined.  *See* Treece Aff. Ex. 6.  The Dean determined that termination was warranted in each case, and that both researchers would have the opportunity to resign in lieu of termination.  *Id.*  Put another way, Chao too was given the option of resigning. Pl.'s 56.1 ¶ 122; Def.'s 56.1 Resp. ¶ 122.

On these facts, I cannot conclude that the remarks relied upon by Chao, when juxtaposed with the extensive testimony and detailed findings that went into the investigation of research misconduct – together with the multiple levels of review by well-respected men and women sitting on independent panels – raise a genuine issue of material fact, nor, in my view, could a rational fact finder infer the requisite discriminatory animus.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of the Court is instructed to close the matter and remove it from my docket.

**SO ORDERED**
**March 22, 2011**
**New York, New York**

_____
Hon. Harold Baer, Jr.
U.S.D.J.

11